[No. S134505. Feb. 1, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN J. DOLLY, Defendant and Appellant.

[black redaction bars]

**COUNSEL**

George L. Schraer, under appointment by the Supreme Court, and Sally P. Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Marc J. Nolan, Donald DeNicola, Mary Sanchez and Peggie Bradford Tarwater, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—In *People v. Wells* (2006) 38 Cal.4th 1078 [45 Cal.Rptr.3d 8, 136 P.3d 810] (*Wells*), we held that an anonymous phone tip reporting a possibly intoxicated driver in a vehicle " 'weaving all over the roadway' " and accurately describing the vehicle and its location was sufficient to justify an investigatory detention, even though police, upon encountering the vehicle, were able to corroborate only the innocent details of the tip. (*Id.* at p. 1081.) In this case, we consider whether an anonymous 911 tip contemporaneously reporting an assault with a firearm and accurately describing the perpetrator, his vehicle, and its location is likewise sufficient to justify an investigatory detention. We conclude that the Fourth Amendment does not bar the police from taking necessary action to protect public safety in the circumstances of this case. We therefore affirm the Court of Appeal, which upheld the denial of the motion to suppress the loaded revolver found in defendant's vehicle.

BACKGROUND

Defendant Norman J. Dolly was convicted after a jury trial of being a felon in possession of a firearm and, after a bench trial, was found to have suffered a prior strike conviction within the meaning of the three strikes law. He was sentenced to four years in prison. The court also found defendant had violated probation and sentenced him to a consecutive eight-month term.

In this appeal, defendant challenges the denial of his motion to suppress the firearm and all statements he made concerning the firearm. The evidence at the hearing on the suppression motion revealed the following:

At 3:16 p.m. on April 17, 2002, an unidentified man placed a call to 911. The call was received by the California Highway Patrol and then transferred to the Los Angeles Police Department. The caller reported that a light-skinned African-American male had "just pulled a gun" on him and had mentioned a gang name. The caller said he felt the perpetrator "was gonna shoot me right there at that minute." According to the caller, the perpetrator had a bandage over his left hand, as though it had been broken, and was in the driver's seat of a gray Nissan Maxima parked on the north side of Jefferson Boulevard at Ninth Avenue, near the recycling center. When asked whether he wanted to talk to the police when they arrived, the caller said, "No, no, I don't. I sure don't. Because if they find out I'm snitching, they're going to kill me around here." The call ended at 3:18 p.m.

At 3:20 p.m., the tipster-victim made a second call to 911. Identifying himself as "Drew," he said that he had just driven by the Nissan Maxima again and wanted to correct his description of the vehicle. It was black, not gray.

Around 3:20 p.m., Los Angeles Police Officer Frank Dominguez and his partner, Officer Goldstein, received a radio call about a man with a gun at Jefferson Boulevard and Ninth Avenue. The perpetrator was described as a light-skinned African-American male with a cast on his arm, in a possibly gray Nissan Maxima on the north side of Jefferson, and was said to have threatened the 911 caller with a gun. Two or three minutes later, the officers arrived at the scene and spotted a black Nissan Maxima parked on the north side of Jefferson, just east of Ninth. There were three people in the car. Defendant, who was sitting in the driver's seat, matched the description provided in the radio dispatch. He also had a cast on his left arm.

Officer Dominguez ordered defendant to exit the vehicle and lie down in the street with his hands at his side. He also ordered the two passengers out of the vehicle. Neither of them was wearing a cast. A loaded .38-caliber blue steel revolver was found underneath the front passenger seat. (At trial, Detective Delicia Hernandez testified that defendant, during a postarrest interview, had admitted owning and possessing the revolver.)

Following the hearing, the superior court denied the motion to suppress, finding (1) that defendant's Fourth Amendment rights were not implicated because he was on probation subject to a search condition, and (2) that the officers had reasonable suspicion defendant had committed a firearms offense before effecting the stop.

A divided panel of the Court of Appeal affirmed in an opinion published in part. The panel ruled first that the detention and search could not be justified by the probation search condition "since the responding officers were not aware of [defendant]'s probation status or condition," citing *People v. Hester* (2004) 119 Cal.App.4th 376, 402–405 [14 Cal.Rptr.3d 377], and *People v. Bowers* (2004) 117 Cal.App.4th 1261, 1270–1271 [13 Cal.Rptr.3d 15]. The Court of Appeal majority found instead that the detention and search were justified by reasonable suspicion that defendant had threatened the anonymous 911 caller with a gun. The dissenting justice, relying on the absence of police corroboration of the criminality alleged in the anonymous tip, would have granted the motion to suppress.

We granted review on the limited issue of whether the anonymous tip was sufficient to justify defendant's detention.

## DISCUSSION

■ An investigatory detention of an individual in a vehicle is permissible under the Fourth Amendment if supported by reasonable suspicion that the individual has violated the law. (*Ornelas v. United States* (1996) 517 U.S. 690, 693 [134 L.Ed.2d 911, 116 S.Ct. 1657].) A peace officer may also search the passenger compartment of the vehicle, limited to those areas in which a weapon may be placed or hidden, if the officer possesses a reasonable belief the suspect is dangerous and may gain immediate control of a weapon. (*Michigan v. Long* (1983) 463 U.S. 1032, 1049 [77 L.Ed.2d 1201, 103 S.Ct. 3469].) In this case, defendant does not dispute that the officers were entitled to search the passenger compartment if reasonable suspicion justified the initial detention. He argues only that the anonymous 911 call did not supply reasonable suspicion to effect the detention.

"The guiding principle in determining the propriety of an investigatory detention is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citations.] In making our determination, we examine 'the totality of the circumstances' in each case." (*Wells, supra*, 38 Cal.4th at p. 1083; see also *People v. Souza* (1994) 9 Cal.4th 224, 227, 230 [36 Cal.Rptr.2d 569, 885 P.2d 982].) "Reasonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause, including an anonymous tip." (*Wells, supra*, 38 Cal.4th at p. 1083.)

Indeed, we recently justified a detention based on an anonymous tip in *Wells*. There, an anonymous caller reported a 1980's-model blue van traveling northbound on Highway 99 north of Bakersfield and weaving all over the roadway. Two or three minutes after receiving the dispatch report, a California Highway Patrol officer spotted a blue van traveling northbound on

Highway 99, activated his patrol car lights, and stopped the van to investigate whether the driver was impaired. The officer had seen nothing to indicate the motorist was intoxicated but, after conducting an investigation at the scene, arrested the motorist for driving under the influence. (*Wells, supra*, 38 Cal.4th at pp. 1081, 1083.)

In upholding the detention, we observed that "a citizen's tip may itself create a reasonable suspicion sufficient to justify a temporary vehicle stop or detention, especially if the circumstances are deemed exigent by reason of possible reckless driving or similar threats to public safety" (*Wells, supra*, 38 Cal.4th at p. 1083), and distinguished the United States Supreme Court's decision in *Florida v. J. L.* (2000) 529 U.S. 266 [146 L.Ed.2d 254, 120 S.Ct. 1375] (*J. L.*), which invalidated a detention based on an anonymous phoned-in tip that a young African-American man in a plaid shirt standing at a particular bus stop had a concealed weapon. "The high court held the tip insufficient to justify a brief detention and patdown search, absent some independent corroboration of the reliability of the tip and tipster's assertion of illegal conduct. [Citation.] As the court stated, '[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L.' " (*Wells, supra*, 38 Cal.4th at p. 1084.) At the same time, however, we noted that the *J. L.* court acknowledged the possibility that exigent circumstances, such as a report of someone carrying a bomb, might justify a stop and search "even without a showing of reliability." (*J. L., supra*, 529 U.S. at p. 273; see *Wells, supra*, 38 Cal.4th at p. 1084.)

After balancing the public interest in safety and the individual's right to personal security free from arbitrary interference by law enforcement officers (see *People v. Thompson* (2006) 38 Cal.4th 811, 827 [43 Cal.Rptr.3d 750, 135 P.3d 3]), we determined in *Wells* that the relative urgency presented by drunk or erratic drivers could justify an investigatory detention based on an anonymous tip despite the absence of corroborating evidence of illegal activity. A tip's reliability, we observed, need not depend exclusively on its ability to predict the suspect's future behavior (see, e.g., *Alabama v. White* (1990) 496 U.S. 325, 332 [110 L.Ed.2d 301, 110 S.Ct. 2412] (*White*)) or the officer's ability to corroborate present illegal activity (see, e.g., *People v. Butler* (2003) 111 Cal.App.4th 150, 162 [4 Cal.Rptr.3d 1]). Rather, the tip's reliability depends upon an assessment of "the totality of the circumstances in a given case." (*Wells, supra*, 38 Cal.4th at p. 1088; accord, *U.S. v. Perkins* (4th Cir. 2004) 363 F.3d 317, 325 ["A rigid rule demanding the presence of predictive information is thus unjustified by *White* and *J. L.*, and it would be wholly inconsistent with the flexible nature of reasonable suspicion analysis"].)

Accordingly, *Wells* relied on the totality of the circumstances in distinguishing *J. L.* We explained first that a report of a possibly intoxicated driver weaving all over the roadway posed "a far more grave and immediate risk to the public than a report of mere passive gun possession." (*Wells, supra,* 38 Cal.4th at p. 1087.) " '[A]n anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action. In the case of a concealed gun, the possession itself might be legal, and the police could, in any event, surreptitiously observe the individual for a reasonable period of time without running the risk of death or injury with every passing moment. An officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury.' " (*Id.* at p. 1086, quoting *State v. Boyea* (2000) 171 Vt. 401 [765 A.2d 862, 867].)

We said next that "doubts regarding the tipster's reliability and sincerity are significantly reduced in the setting of a phoned-in report regarding a contemporaneous event of reckless driving presumably viewed by the caller. Instances of harassment presumably would be quite rare." (*Wells, supra,* 38 Cal.4th at p. 1087.) Indeed, "the relatively precise and accurate description given by the tipster in the present case regarding the vehicle type, color, location, and direction of travel, all confirmed by the investigating officer within minutes of receiving the report, enhanced the reliability of the tip." (*Id.* at p. 1088.) Based on that level of detail and the officer's ability to corroborate it, we inferred that the observation of reckless driving must have come from a passing motorist. (*Ibid.*) In light of the tip's detailed and contemporaneous description, the officer's ability promptly to corroborate its innocent details, and the danger posed by a motorist under the influence, we were "convinced" in *Wells* "that the officer's traffic stop was justified by reasonable suspicion of criminal activity." (*Ibid.*)

Consideration of these (and other factors) convinces us that the detention should be upheld in this case.

■ First, defendant's conduct in pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but also to anyone nearby. (*U.S. v. Holloway* (11th Cir. 2002) 290 F.3d 1331, 1339 (*Holloway*) [anonymous 911 call reporting gunshots and arguing "involved a serious threat to human life"].) "[A]llegations of the threatening use of a weapon, made by [a] person claiming to be an eyewitness to the threats, required immediate police action" and "is materially distinguishable from the anonymous tip at issue in *Florida v. J. L.*," which involved only an allegation of a concealed weapon. (*Ray v. Village of Woodridge* (N.D.Ill. 2002) 221 F.Supp.2d 906, 914; see also *U.S. v. Nelson* (3d Cir. 2002) 284 F.3d 472, 483 ["the critical element alleged in the tip was not the mere presence of a gun, but the fact that violent crimes were in the process of being committed"].) An allegation concerning the possession of a concealed weapon,

"without more" (*J. L.*, *supra*, 529 U.S. at p. 268), does not present an emergency situation involving an immediate danger to human life. (*Holloway*, *supra*, 290 F.3d at pp. 1338–1339; accord, *People v. Jordan* (2004) 121 Cal.App.4th 544, 562–564 [17 Cal.Rptr.3d 157] [anonymous tip that suspect possessed a concealed weapon insufficient to justify detention]; *People v. Saldana* (2002) 101 Cal.App.4th 170, 175 [123 Cal.Rptr.2d 763] [same].)

Defendant's suggestion that the emergency had ended in this case because the 911 call was "a report of an assault that had been completed, not one that is occurring" is not persuasive.[1] In *U.S. v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170 (*Terry-Crespo*), for example, the Ninth Circuit found that a 911 caller's report describing a threat with a .45-caliber handgun a few minutes earlier constituted "a contemporaneous emergency event," even though the tipster was a mile and a half away by the time the police arrived at the scene. (*Id.* at p. 1176.) In this case, the caller was still in the area, inasmuch as he had just driven by defendant's vehicle to verify its color, and cannot be said to have reached a place of safety as long as defendant remained at large and had use of his vehicle. In this context, defendant remained "extremely mobile, and potentially highly dangerous" to the tipster-victim and potentially to others in the area (*U.S. v. Wheat* (8th Cir. 2001) 278 F.3d 722, 737)—regardless of whether the tipster-victim subjectively apprehended the danger.

Indeed, defendant concedes that "an imminent threat to kill constitute[s] an emergency situation" justifying a stop even when the intended victim is elsewhere, yet fails to distinguish the circumstances here. In our view, the interest in protecting human life, even if insufficient in this case to dispense entirely with the need to demonstrate the anonymous tip's reliability (see *J. L.*, *supra*, 529 U.S. at p. 273), is nonetheless an important factor to consider in assessing the requisite level of reliability. (*Wells*, *supra*, 38 Cal.4th at pp. 1084, 1087.)

---

[1] Defendant also challenges the trial court's implied finding that Officer Dominguez was aware the 911 caller had been threatened with the gun, pointing out that the tape of the radio dispatch did not include the word "threat." The challenge lacks merit. As defendant concedes, the radio broadcast included a number of police codes, any of which may have communicated the fact of the threat. Moreover, defendant has not shown that the taped broadcast constituted the totality of the communications received by the patrol officers. Consequently, he has not refuted Officer Dominguez's direct testimony that he was aware, prior to the stop, the caller had been threatened with the gun. Finally, because defendant never argued below that the officers lacked knowledge of the contents of the 911 call, thereby denying the People the opportunity to offer contrary evidence, he has forfeited any challenge to the use of the caller's statements. (Evid. Code, § 353; *Anthony v. City of New York* (2d Cir. 2003) 339 F.3d 129, 136, fn. 3.) Indeed, it was *defendant* who offered the tape of the 911 call at the suppression hearing, without requesting any limitation on its use, and relied on its contents.

■ Second, there is no reason to think that anonymous phoned-in tips concerning contemporaneous threats with a firearm are any more likely to be hoaxes than are anonymous phoned-in tips concerning a contemporaneous event of reckless driving. (Compare *Terry-Crespo, supra*, 356 F.3d at p. 1177, with *Wells, supra*, 38 Cal.4th at p. 1087.) Indeed, the call here bore stronger indicia of reliability than did the call in *Wells*. Unlike *Wells*, where the record was "silent" as to the circumstances leading to the call or the call itself (*id.* at p. 1081), this case involves a 911 call that was taped. "911 calls are the predominant means of communicating emergency situations" and "are distinctive in that they concern contemporaneous emergency events, not general criminal behavior. . . . If law enforcement could not rely on information conveyed by anonymous 911 callers, their ability to respond effectively to emergency situations would be significantly curtailed." (*Holloway, supra*, 290 F.3d at p. 1339; see *Terry-Crespo, supra*, 356 F.3d at p. 1176 [911 calls are "entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch"]; *State v. Golotta* (2003) 178 N.J. 205 [837 A.2d 359, 366] [an anonymous tip placed and processed via the 911 system "carries enhanced reliability not found in other contexts"].)

Furthermore, "[m]erely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify [the caller] by his voice." (*Terry-Crespo, supra*, 356 F.3d at p. 1176.) Although defendant is certainly correct that it may be difficult for the authorities to locate a 911 caller solely by voice, the victim of a hoax *is* likely to recognize the harassing caller's voice, thus creating a reasonable possibility of prosecution for a false report. (See Pen. Code, § 148.5, subd. (c).) Therefore, we see no inherent reason to discount anonymous 911 calls reporting contemporaneous violent conduct observed firsthand merely because of the theoretical possibility the caller may be motivated to make a false report because of a vendetta. (See *U.S. v. Wheat, supra*, 278 F.3d at p. 735 ["the risk of false tips is slight compared to the risk of not allowing the police immediately to conduct an investigatory stop"]; see generally *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 372 [7 Cal.Rptr.3d 803, 81 P.3d 244] ["We note the absence of any indication that such malicious communications present a widespread problem"].)[2]

---

[2] The fact that the call here was taped provides two additional safeguards against arbitrary police action. As defendant concedes, the existence of the tape eliminates "the specter of after-the-fact, police fabrication of an 'anonymous informant.' " (*Terry-Crespo, supra*, 356 F.3d at p. 1175; accord, *Commonwealth v. Lyons* (1990) 409 Mass. 16 [564 N.E.2d 390, 392].) The tape also offers a reviewing court the opportunity to discover whether anything about the caller's tone, demeanor, or actual words suggested that the report was fabricated. (*State v. Williams* (2001) 2001 WI 21 [241 Wis.2d 631, 623 N.W.2d 106, 115].) We have listened to the 911 call and have found nothing in it that casts doubt on the tipster-victim's veracity.

"There is the equal danger, moreover, that according no weight to 'anonymous' tips in the reasonable suspicion calculus will undermine the ability of concerned residents to report illegal activity and to thereby make their neighborhoods more safe. Residents of neighborhoods are in the best position to monitor activity on the streets. But residents, also fearful of the consequences, may not always wish to identify themselves and volunteer their names. According no weight as a matter of law to such 'anonymous' tips would only discourage concerned residents from even calling the police, would burden the rights of ordinary citizens to live in their neighborhoods without fear and intimidation, and would render citizens helpless in their efforts to restore safety and sanctity to their homes and communities." (*U.S. v. Perkins, supra,* 363 F.3d at p. 326.)[3]

Third, the tipster-victim provided a firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived. (*U.S. v. Perkins, supra,* 363 F.3d at p. 322 ["The tipster's basis of knowledge—a contemporaneous viewing of the suspicious activity—enhanced the tip's reliability"]; *People v. Polander* (Colo. 2001) 41 P.3d 698, 702.) It has long been clear that "a primary determinant of a tipster's reliability is the basis of his knowledge." (*U.S. v. Wheat, supra,* 278 F.3d at p. 734; see *Illinois v. Gates* (1983) 462 U.S. 213, 234 [76 L.Ed.2d 527, 103 S.Ct. 2317] ["even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"].) This case is thus unlike *J. L.,* in which the informant "neither explained how he knew about the [concealed] gun nor supplied any basis for believing he had inside information" (*J. L., supra,* 529 U.S. at p. 271) and in which the record did not reveal when the caller discovered the suspect had a concealed weapon or how soon the police responded to the call (*id.* at p. 268). The police "may ascribe greater reliability to a tip, even an anonymous one, where an informant 'was reporting what he had observed moments ago,' not stale or second-hand information." (*Terry-Crespo, supra,* 356 F.3d at p. 1177.) The record here is stronger even than that in *Wells,* in which we *inferred* that the tip of reckless driving must have come from a passing motorist. (*Wells, supra,* 38 Cal.4th at p. 1088; see also *id.* at p. 1092 (dis. opn. of Werdegar, J.).) The tip's reliability was further enhanced by the tipster-victim's second call to 911, in

---

[3] The unreasonable consequences of defendant's position—i.e., that an anonymous tip uncorroborated by the officer's observation of illegal activity or predicted behavior can *never* justify a detention—were demonstrated at oral argument. Defense counsel contended that the police would be unable to effect a stop of a vehicle in response to a tip that the driver had just abducted a young child from a nearby playground if the caller refused to disclose his or her identity. Under defendant's approach, the police could do no more than follow the vehicle and watch helplessly as the driver entered the garage and closed the door.

which he said that he had just driven by the scene and reported that the Nissan Maxima in which defendant was sitting was black, not gray. (*State v. Williams, supra,* 623 N.W.2d at p. 114.) Defendant does not deny that the tip here "was sufficiently copious and precise." (*U.S. v. Wheat, supra,* 278 F.3d at p. 732.)

Fourth, the caller supplied a plausible explanation for wanting to remain anonymous. He noted that defendant had uttered a gang name, worried that "I don't have anyone to defend me from all this gang shit," and explained that "if they find out I'm snitching, they're going to kill me around here." That the tipster "may be understandably reticent to give identifying information for fear of retaliation or danger" reduces the significance of his anonymity in analyzing the reliability of his report. (*Holloway, supra,* 290 F.3d at p. 1339.) Defendant's contention that nothing in the record showed that the tipster-victim had a basis for fearing retaliation "due to *ongoing* contact with [defendant]," even if true, does not affect the analysis.

Defendant relies on a handful of out-of-state decisions in urging us to deem this detention unlawful, but the cases are easily distinguished. In *People v. Folk* (2001) 284 A.D.2d 476 [727 N.Y.S.2d 131] and *People v. Ballard* (2001) 279 A.D.2d 529 [719 N.Y.S.2d 267], for example, the anonymous tipster reported only that the defendant had a concealed weapon. Both cases quoted *J. L.* in pointing out that the informant " 'neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]' " and that the report did not show " 'that the tipster ha[d] knowledge of concealed criminal activity.' " (*Folk, supra,* 727 N.Y.S.2d at p. 132; *Ballard, supra,* 719 N.Y.S.2d at p. 268; see also *U.S. v. Blackshaw* (N.D. Ohio 2005) 367 F.Supp.2d 1165, 1172 ["At most, the anonymous call provided a clothing description, a vehicle description, an approximate location, and report of a handgun"]; *U.S. v. Person* (E.D.N.Y. 2001) 134 F.Supp.2d 517, 527 ["imminent danger would warrant a stop based on an unverified anonymous tip," but "[t]he tip here involved little more than a general description and the allegation of gun possession"]; *People v. Carlson* (2000) 313 Ill.App.3d 447 [246 Ill.Dec. 207, 729 N.E.2d 858, 859] [the tip provided the defendant's location and stated merely that he "might have a gun"]; *State v. Hopkins* (2005) 128 Wn.App. 855 [117 P.3d 377, 381] [the tip "contained inaccurate information about Hopkins' height, weight, and age" and reported only "that a minor was 'scratching his leg' with 'what appeared to be a gun,' and that he 'thinks' the gun is in Hopkins' right pocket"].) Unlike *J. L.,* the tip here involved the visible and threatening use of the weapon and supplied the basis for the tipster's

knowledge. (*Ray v. Village of Woodridge, supra*, 221 F.Supp.2d at p. 914; see *Scott v. Com.* (1995) 20 Va.App. 725 [460 S.E.2d 610, 612–613, 12 Va.LawRep. 127].)[4]

We likewise decline to follow *People v. Braun* (2002) 299 A.D.2d 246 [750 N.Y.S.2d 58], which involved an anonymous tip of a recent burglary, or *People v. Moore* (2006) 6 N.Y.3d 496 [814 N.Y.S.2d 567, 847 N.E.2d 1141], which involved an anonymous tip of a dispute involving a gun, because both courts interpreted *J. L.* as barring reliance on an anonymous tip unless the tip "contains predictive information—such as information suggestive of criminal behavior—so that the police can test the reliability of the tip" (*Moore, supra*, 814 N.Y.S.2d at p. 569) or is corroborated by the officer's direct observation "of conduct or other circumstances suggestive of criminal activity" (*Braun, supra*, 750 N.Y.S.2d at p. 59). (See also *U.S. v. Person, supra*, 134 F.Supp.2d at p. 525 ["reasonable suspicion can be based on either a corroborated anonymous tip which verifies predicted future events, as in *White*, or on a tip involving a present situation, which the police independently corroborate"].) These cases are contrary to *Wells*, which eschewed such rigid categories in favor of an approach that assesses reliability under the totality of the circumstances. (*Wells, supra*, 38 Cal.4th at p. 1083; *J. L., supra*, 529 U.S. at p. 274 (conc. opn. of Kennedy, J.) ["there are many indicia of reliability respecting anonymous tips"]; see generally *People v. Souza, supra*, 9 Cal.4th at p. 230 [case law has "stressed the importance of taking into account 'the totality of the circumstances' in determining the propriety of an investigative stop"].) Tellingly, neither *Moore* nor *Braun* even contains the phrase "totality of the circumstances."

■ "[T]here are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion

---

[4] Defendant relies also on *People v. Jordan, supra*, 121 Cal.App.4th 544, which he characterizes as "unusually, even eerily, similar" to this case. He is very much mistaken. In *Jordan*, unlike here, the responding officers knew only that the defendant " '[p]ossibly' " had a concealed handgun. (*Id.* at p. 550; see *id.* at pp. 559–560 & fn. 8.) In *Jordan*, unlike here, the record did not indicate how much time elapsed between the end of the telephone call and the radio transmission of the information to the officers. (*Id.* at p. 558, fn. 7; see also *J. L., supra*, 529 U.S. at p. 268 [noting a similar deficiency in the record].) In *Jordan*, unlike here, the tipster did not disclose how he knew the defendant had a concealed weapon, nor did he say "whether he personally saw the gun, inferred its presence from other facts he observed, inferred its presence from [Jordan]'s reputation, or received the information from another individual" or even "when he acquired the information." (*Jordan, supra*, at pp. 559, 560.) In *Jordan*, unlike here, there was no explanation offered as to why the caller wanted to remain anonymous. And in *Jordan*, unlike here, the level of danger was "comparable to the level of danger shown by the facts described in *Florida v. J. L.*" (*Jordan, supra*, at p. 563.) Based on these circumstances, the Court of Appeal found only one factor on which to distinguish *J. L.*—i.e., the fact the anonymous tip was recorded and transcribed—but otherwise found "no principled way to distinguish this case" and concluded "that the opinion in *Florida v. J. L.* dictates the result." (*Jordan, supra*, at p. 562.)

to make the investigatory stop.' " (*J. L., supra*, 529 U.S. at p. 270.) As the high court has explained, however, the tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." (*Id.* at p. 272.) In this case, the 911 call was a firsthand report of violent criminal conduct requiring an immediate response to protect public safety. The call was recorded, eliminating the possibility of after-the-fact police fabrication and allowing after-the-fact review (albeit limited) of the caller's sincerity. The report was fresh, detailed, and accurate, and its description of defendant and his location was corroborated by the police within minutes. Under the totality of the circumstances, we find there was sufficient indicia that the 911 caller was able to see the criminal conduct he was reporting, that he was reporting it truthfully and accurately, and thus that the tip was sufficiently reliable to justify the limited intervention of an investigatory detention, which led to discovery of the loaded revolver. The superior court did not err in denying the motion to suppress.

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Chin, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring.—I agree with the majority's conclusion that the police in this case acted reasonably in detaining defendant, and that the trial court therefore properly denied defendant's motion to suppress the fruits of that detention. Because I find the majority's reasoning underlying its conclusion unpersuasive, I write separately to set forth my views.

I

In the afternoon of April 17, 2002, an unidentified man called the California Highway Patrol, whose dispatcher transferred the call to the Los Angeles Police Department. The caller reported that a light-complected African-American man had just pulled a gun on him. He said the suspect was wearing a bandage on his left hand and was sitting in the driver's seat of a gray Nissan Maxima parked on the north side of Jefferson Boulevard, near the corner of Ninth Avenue, in Los Angeles. The caller did not wish to give his name because the suspect had mentioned a gang and the caller feared retaliation from the gang for "snitching." About four minutes later, the caller made a second call to the police; he said he had just driven by the intersection where the car was located and wanted to correct his description of the car—the Nissan was black, not gray. He again refused to give his last name, but said his first name was "Drew."

Within minutes after that second call, Los Angeles Police Officer Frank Dominguez, accompanied by his partner, Officer Goldstein, drove to the location in question. There they saw a man (defendant), who matched the caller's description, seated in the driver's seat of a black Nissan Maxima. They detained him and searched the car, finding a handgun under the front passenger seat.

Defendant was charged with possession of a firearm by a convicted felon. He moved to suppress the gun, claiming the detention and the ensuing car search violated his rights under the Fourth Amendment of the federal Constitution. The trial court denied his motion to suppress, and a jury thereafter found him guilty as charged. The Court of Appeal affirmed the conviction, rejecting defendant's contention that the officers lacked reasonable cause to detain him.

## II

The pertinent analysis to resolve the issue here is, in my view, as follows.

In the words of the United States Supreme Court: "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. [Citations.] Because the 'balance between the public interest and the individual's right to personal security,' [citation], tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity ' "may be afoot." ' [Citations.] [¶] When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." (*United States v. Arvizu* (2002) 534 U.S. 266, 273 [151 L.Ed.2d 740, 122 S.Ct. 744] (*Arvizu*).)

Thus, this court must decide here whether, under the totality of circumstances, the anonymous calls described above gave the detaining officers a " 'particularized and objective basis' for suspecting legal wrongdoing." (*Arvizu, supra,* 534 U.S. at p. 273.) Defendant, relying on *Florida v. J. L.* (2000) 529 U.S. 266 [146 L.Ed.2d 254, 120 S.Ct. 1375] (*J. L.*), argues that because the caller in this case never gave the police his last name, the information he gave in his telephone calls did not give rise to a reasonable suspicion that defendant was involved in criminal activity, and that he therefore should not have been detained.

In *J. L.*, the police received an anonymous tip that an African-American man in a plaid shirt at a specified bus stop was carrying a concealed firearm. The police found a man matching that description at the bus stop in question. They detained him, patted him down, and found a gun. The United States Supreme Court held that the detention was illegal because the anonymous tip was insufficiently reliable to justify the detention. The court explained: "All the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." (*J. L.*, *supra*, 529 U.S. at p. 271.) In rejecting the prosecution's argument that the tip was reliable because it accurately described "the suspect's visible attributes" (*ibid.*), the court stated the information did not show "that the tipster ha[d] knowledge of concealed criminal activity." (*Id.* at p. 272.) An anonymous tip, the court held, does not give rise to a reasonable suspicion of criminal activity unless it is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." (*Ibid.*)

The facts of *J. L.*, *supra*, 529 U.S. 266, are distinguishable from the facts here, where the two anonymous telephone calls, tape recordings of which were admitted as an exhibit at the hearing on defendant's motion to suppress, provided the police with a " 'particularized and objective basis' for suspecting legal wrongdoing." (*Arvizu*, *supra*, 534 U.S. at p. 273.) As the Court of Appeal explained: "Here, the urgency in the caller's tone was evident on the recording. The caller said the man had a gun in his pocket, and 'he just pulled it on me right now, man.' He added that the man mentioned a gang name and he felt the man was going to shoot him 'right there that minute.' He said that he knew it was not right for him to 'snitch' as far as the streets were concerned, but he was not from the area and had no one to defend him." The caller also said he wanted to "try to do things right by the law" and was trying to be as helpful as possible without risking retaliation from neighborhood gangs. He even drove by the intersection again and called a second time to confirm that the suspect was there and to more accurately describe the color of the car, and he gave his first name to the 911 operator.

In this case, unlike *J. L.*, the police did not have "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." (*J. L.*, *supra*, 529 U.S. at p. 271.) Instead, the anonymous caller explained that he knew that defendant had a gun because defendant had "just pulled it on" the caller. Given the totality of circumstances surrounding the calls—the caller's tone of voice,[1] his willingness to make a second call to make sure

---

[1] In her concurring opinion, Justice Werdegar concludes that an appellate court should not consider an anonymous caller's tone of voice in determining the legality of a detention based on that call unless the "dispatcher or the police officer effecting the detention *actually relied on*

that the police stopped the right car, his description of the assault committed on him, and his plausible explanation for his desire for anonymity—the police could reasonably conclude that he was a crime victim describing an assault that had been committed on him. "It may . . . be stated as a general proposition that private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt upon their information, should be considered reliable." (*People v. Ramey* (1976) 16 Cal.3d 263, 269 [127 Cal.Rptr. 629, 545 P.2d 1333].)

For these reasons, the police officers here had a reasonable suspicion that defendant was engaged in criminal activity. Thus, their investigatory detention of defendant did not violate the Fourth Amendment, and the trial court properly denied defendant's motion to suppress evidence. The majority comes to the same conclusion, but its analysis is different, as discussed below.

## III

The majority gives four reasons why, in its view, the police had a reasonable suspicion that defendant was engaged in criminal conduct. First, it explains that defendant's alleged act of pointing a gun at the caller posed a grave danger to the public. (Maj. opn., *ante*, at pp. 465–467.) Second, it states that "anonymous phoned-in tips concerning contemporaneous threats with a firearm are [no] more likely to be hoaxes than are anonymous phoned-in tips concerning a contemporaneous event of reckless driving" (*id.* at p. 467) and the call here was particularly reliable because it was recorded (*id.* at p. 467). Third, according to the majority, "the tipster-victim provided a firsthand, contemporaneous description of the crime as well as an accurate

the caller's vocal tone in assessing his reliability." (Conc. opn. of Werdegar, J., *post*, at p. 479, fn. 3, italics added.) In my view, an appellate court may consider the tone of the caller's voice so long as it is objectively reasonable for the dispatcher to have done so. (*J. L., supra*, 529 U.S. at pp. 275–276 (conc. opn. of Kennedy, J.); see also *Scott v. United States* (1978) 436 U.S. 128, 138 [56 L.Ed.2d 168, 98 S.Ct. 1717]; *People v. Conway* (1994) 25 Cal.App.4th 385, 388 [30 Cal.Rptr.2d 533].)

Justice Werdegar's concurring opinion also asserts that to permit consideration of an anonymous caller's tone of voice "as a factor demonstrating reliability of an anonymous tip would potentially swallow the rule, for one can imagine that virtually all callers to police emergency numbers betray some agitation and emotion in their voices." (Conc. opn. of Werdegar, J., *post*, at p. 479, fn. 3.) But this would be true only if an anonymous caller's tone of voice could, *by itself*, establish the caller's reliability. In my view, a caller's tone of voice does not itself demonstrate the call's reliability, but it is nevertheless a factor that appellate courts may consider in determining whether the call is sufficiently reliable to justify a detention.

Justice Werdegar's concurrence also notes that here the parties did not discuss the anonymous caller's tone of voice at the hearing on the motion to suppress evidence. True, but irrelevant. Because a tape recording of the telephone calls was admitted into evidence as an exhibit, it is part of the appellate record, and the caller's tone of voice is relevant evidence that this court may consider.

and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Id.* at p. 468.) Fourth, the majority notes that "the caller supplied a plausible explanation for wanting to remain anonymous." (*Id.* at p. 469.)

The first of the majority's reasons (that the conduct reported to the police by the anonymous caller posed a danger to the public) has no bearing on the issue, which is whether the police could reasonably suspect that defendant was engaged in criminal conduct. This is why: The degree of danger posed by a suspect has no logical relationship to the reliability of the information provided. True, the high court in *J. L.* strongly hinted that in certain exigent circumstances—such as an anonymous tip that a suspect is carrying a bomb—the police may detain a suspect even *without* reasonable suspicion. (*J. L.*, *supra*, 529 U.S. at pp. 273–274.) But by relying on facts pertaining to defendant's dangerousness as proof that the police had reasonable cause to detain him, the majority here conflates two distinct and unrelated questions: first, whether the detaining officers *have reasonable suspicion* of criminal activity (the issue here); second, whether exigent circumstances justify a detention *without reasonable suspicion*.

Assuming for the sake of argument that here the existence of such exigent circumstances is at issue, in my view there was no exigency. The anonymous caller did not report an ongoing assault; rather, he said a person had just pulled a gun on him, and that man was now sitting in a car in a particular location. When last seen by the caller, the man with the gun was not threatening anyone. Thus, the situation was analogous to that presented in *J. L.*, *supra*, 529 U.S. 266, where the suspect was reported to be standing at a bus stop, carrying a concealed firearm.

The majority's second reason for here upholding the detention—its conclusion that reports of threats with firearms are no more likely to be hoaxes than are reports of reckless driving, and that the call here was particularly reliable because it was recorded—is based primarily on this court's recent decision in *People v. Wells* (2006) 38 Cal.4th 1078 [45 Cal.Rptr.3d 8, 136 P.3d 810] (*Wells*). In *Wells*, a majority of this court held that an anonymous call reporting that a blue van had been weaving justified a stop of that van, even though the officer who located a van matching the caller's description observed no weaving or other conduct suggestive of illegality. The majority's decision in *Wells* was wrong for the reasons explained in Justice Werdegar's dissent in that case, which I joined. (See *id.* at pp. 1089–1095 (dis. opn. of Werdegar, J.).) Similarly flawed, therefore, is the majority's reliance on *Wells* in this case.

Even if the majority's decision in *Wells*, *supra*, 38 Cal.4th 1078, were correct, I see no basis for the majority's assertion that here the reliability of

an anonymous telephone call can be determined based on the *type of crime reported*. Some reports of threats with firearms are reliable while others are not; some reports of reckless driving are reliable while others are not. Whether a particular anonymous tip to the police gives rise to a reasonable suspicion of criminal conduct is a fact-intensive question that must be decided based on the precise information provided. I see nothing in the decisions of the United States Supreme Court to support the majority's categorical approach here, which seems to treat *all* anonymous tips of reckless driving and firearm use as reliable because of the nature of those crimes.

Nor am I persuaded by the majority's heavy reliance on the circumstance that the anonymous call was recorded. In my view, the crucial question is not whether the call was recorded, but what the caller said; that is, whether "the dispatcher or arresting officer had any objective reason to believe that this tip had some particular indicia of reliability." (*J. L.*, *supra*, 529 U.S. at pp. 275–276 (conc. opn. of Kennedy, J.).)

The majority's third and fourth reasons for upholding the detention—that the anonymous caller gave a firsthand description of the crime and a plausible reason for remaining anonymous—are generally similar to the reasons I have given for reaching the same conclusion, and I therefore have no quarrel with them. The majority, however, relegates these reasons to the end of its discussion, and it appears to regard them as less significant.

## IV

For the reasons given above, I agree with the majority that the judgment of the Court of Appeal should be affirmed.

**WERDEGAR, J.,** Concurring.—I concur in the judgment. I write separately to explain why I do not join in the entirety of the majority's reasoning.

For the second time in less than a year, this court has been asked to evaluate the constitutional validity of a law enforcement response to an anonymous phoned-in report of potential criminality (see *People v. Wells* (2006) 38 Cal.4th 1078 [45 Cal.Rptr.3d 8, 136 P.3d 810] (*Wells*)) and to apply the rule about such reports laid down by the United States Supreme Court in *Florida v. J. L.* (2000) 529 U.S. 266 [146 L.Ed.2d 254, 120 S.Ct. 1375] (*J. L.*). In *J. L.*, police received an anonymous tip that a young African-American male wearing a plaid shirt was standing at a particular bus stop and was carrying a concealed weapon. Police located a person at the bus stop who matched the tipster's description but failed to observe any criminal behavior. They nevertheless detained and searched the man, discovering a concealed

weapon. The high court unanimously invalidated the search, reasoning that confirmation of the innocent details of an anonymous tip was insufficient to supply reasonable cause to detain. "An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. *The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.*" (*Id.* at p. 272, italics added.)

*Wells* posed a similar situation, but a majority of this court came to a different conclusion. In *Wells*, an anonymous caller reported the existence of a blue van traveling in a certain direction on the highway " 'weaving all over the roadway.' " (*Wells, supra,* 38 Cal.4th at p. 1081.) Police located a van matching the description but did not confirm any criminality, i.e., the van was not weaving or speeding, and the van's driver was apparently obeying all relevant traffic laws. Based solely on the information provided in the anonymous tip, however, police stopped the vehicle and arrested the driver on finding she appeared intoxicated. A majority of this court upheld that search and seizure, citing a plethora of purported justifications: the *Wells* majority distinguished *J. L.* because the possibility of a drunk driver weaving on the highway posed "a far more grave and immediate risk to the public than a report of mere passive gun possession [as in *J. L.*]" (*Wells,* at p. 1087); the state has a strong interest in preventing drunk driving (*ibid.*); the tipster had personal knowledge of the crime because he or she "presumably" viewed the van weaving (*ibid.*); the level of personal intrusion accompanying a traffic stop is "considerably less" than the patsearch in *J. L.* (*ibid.*); in light of the " 'pervasive regulation' " of vehicles on public roadways, people have a reduced expectation of privacy when in their cars (*ibid.*); and the tip's description of the van was sufficiently detailed to permit an inference it was reliable (*id.* at p. 1088).

I dissented in *Wells* because the majority's multiple stated rationales, alone or in combination, were unpersuasive in light of *J. L., supra,* 529 U.S. 266. The instant case, by contrast, presents a closer question than in *Wells*, for the anonymous caller in this case reported defendant had threatened him *personally* with a gun, thereby establishing (to the extent such can be established by an anonymous tip) that the caller had personal knowledge of the crime. This circumstance is critically important. The *J. L.* court emphasized that an anonymous tip, though corroborated as to its innocent aspects, was insufficient to supply reasonable cause to detain, in part because the "unaccountable informant . . . *neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].*" (*J. L.,* at p. 271, italics added; see also *id.* at p. 270, quoting *Alabama v. White* (1990) 496 U.S. 325, 329 [110 L.Ed.2d 301, 110 S.Ct. 2412] [" 'an anonymous tip

alone seldom demonstrates the informant's basis of knowledge or verac-
ity' "].) The majority in *Wells* argued the tipster in that case must personally
have seen the blue van weaving all over the roadway, but, as I explained
in my dissent, the argument failed because the conclusion was without
factual support; the majority merely *presumed* the tipster was an eyewitness
to the illegal activity. (*Wells*, *supra*, 38 Cal.4th at p. 1092 (dis. opn. of
Werdegar, J.).) "That the tip [in *Wells*] was from another driver or any other
eyewitness is no more than conjecture; nothing is known of the identity of the
tipster *or the basis of the tipster's knowledge*." (*Ibid.*, italics added.)

By contrast, the tipster in this case was not completely anonymous; he
revealed his name was "Drew." More importantly, he was an eyewitness to
the illegal activity. He reported to police that someone matching defendant's
description had "just pulled a gun" on him and threatened to shoot him. A
few minutes after his initial call, "Drew" called back to report that he had
driven by the crime scene again and his initial description of the car was
incorrect, further indicating he was actually at the scene and had personal
knowledge of the crime.

These facts distinguish the instant case from *Wells*, *supra*, 38 Cal.4th 1078,
where the record was devoid of evidence the tipster had personal knowledge
of any crime. *J. L.*, *supra*, 529 U.S. 266, is distinguishable on this ground as
well, for the caller in that case provided no information suggesting he or she
had personal knowledge of any criminality. On balance, then, I agree with the
majority here that Officer Dominguez, responding to "Drew's" report that
someone matching defendant's description had just threatened him with a
firearm, did not violate defendant's rights under the Fourth Amendment to the
United States Constitution when the officer detained and searched him.

I write separately because I cannot subscribe to the remainder of the
majority's analysis. The *J. L.* court explained that anonymous tips were
different from those made by callers known to police, both because the
reputation of known callers can be assessed and known callers can be held
responsible if their allegations turn out to be fabricated. (*J. L.*, *supra*, 529 U.S.
at p. 270.) The *J. L.* court held that when deciding whether an anonymous tip
supplies reasonable cause to detain and search, the critical question is
whether the tip bore " 'sufficient indicia of reliability.' " (*Ibid.*) The majority
here reasons "Drew's" tip supplied sufficient indicia of reliability because he
called the 911 emergency number and the call was recorded. (Maj. opn., *ante*,
at p. 467.) The majority fails, however, to explain how either circumstance
enhances the caller's reliability, that is, how an anonymous caller's use of the
familiar 911 line or the recording of the call will assist courts in evaluating

the caller's reputation or veracity, or will permit police to hold the caller responsible for a false or fabricated tip.[1]

Contrary to the majority's implication, someone who wishes to make a false accusation, perpetrate a hoax, or is merely mistaken, can do so just as easily by calling 911 as by calling police on a nonemergency line.[2] Similarly flawed is the majority's reliance on the fact the telephone call was recorded. The majority reasons an anonymous call that is recorded is more reliable because the caller risks being identified by his or her voice or having the call traced to its originating location. (Maj. opn., *ante*, at p. 467.) Left unexplained is how the mere recording of a telephone call facilitates tracing it to its source. Nor is there any evidence callers are aware their call will be recorded or that officers in the field review such recordings to see if they recognize the tipster's voice before responding to the call. That *this court*, as the majority assures us, has listened to the call and found "nothing in it that casts doubt on the tipster-victim's veracity" (maj. opn., *ante*, at p. 467, fn. 2) seems patently irrelevant to the issue at hand, i.e., whether when made the call provided police with justification for intruding on defendant's Fourth Amendment rights.[3] In short, an anonymous call, without more, provides little or no information about the reliability or trustworthiness of the caller, irrespective of whether the call was to 911 and was recorded.

That police must take 911 calls " 'seriously and respond with dispatch' " (maj. opn., *ante*, at p. 467, quoting *U.S. v. Terry-Crespo*, *supra*, 356 F.3d at p. 1176) and should not "discount anonymous 911 calls reporting contemporaneous violent conduct" (maj. opn., *ante*, at p. 467) responds to an argument no one is making. Nothing in *J. L.* (or, for that matter, my dissenting opinion in *Wells*, *supra*, 38 Cal.4th 1078, 1089) suggests police are powerless *to respond* to an anonymous 911 call or that police should ignore or discount such calls. Indeed, once police are on the scene, they may be able to corroborate some criminal aspect of an anonymous tip. *J. L.* merely teaches that an anonymous tip must bear some indicia of reliability, such as being

---

[1] The majority relies on *U.S. v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170, 1176, but that case did not involve an anonymous call.

[2] Moreover, the majority's analysis distinguishing 911 calls from other calls to police potentially reduces the holding of *J. L.* almost to the vanishing point, for most calls to police are 911 calls.

[3] Unlike Justice Kennard, in her concurring opinion, I put no weight on the "tone" of the caller's voice or the "urgency" he conveyed. (Conc. opn. of Kennard, J., *ante*, at p. 473.) First, the relative degree of urgency one might glean from the caller's vocal inflection was not litigated below, rendering reliance on that factor suspect; second, nothing in the record suggests the dispatcher or the police officer effecting the detention actually relied on the caller's vocal tone in assessing his reliability; and third, to recognize an agitated or urgent vocal tone as a factor demonstrating reliability of an anonymous tip would potentially swallow the rule, for one can imagine that virtually all callers to police emergency numbers betray some agitation and emotion in their voices.

corroborated as to its criminal aspects and not just its innocent details, before such a tip is sufficient to warrant the invasion of a person's Fourth Amendment rights.

Finally, the majority's conclusion that the anonymous tip here was sufficiently reliable because the tipster provided "an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived" (maj. opn., *ante*, at p. 468), fails to apprehend that it was exactly this type of confirmation of the innocent details of an anonymous tip that the high court in *J. L* held to be insufficient. "The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." (*J. L.*, *supra*, 529 U.S. at p. 272, quoted with approval in the maj. opn., *ante*, at p. 471.)

The majority suggests this case falls outside *J. L.*'s insistence that police determine whether an anonymous call bears sufficient indicia of reliability because the crime reported involved a "grave and immediate risk not only to the caller but also to anyone nearby." (Maj. opn., *ante*, at p. 465.) To be sure, the *J. L.* court left open the possibility that an anonymous tip warning of some catastrophic harm, such as a person carrying a bomb, could "justify a search even without a showing of [the tip's] reliability." (*J. L.*, *supra*, 529 U.S. at pp. 273–274.) But the anonymous tip here, reporting defendant had threatened the caller with a firearm (but apparently was no longer doing so) did not pose a danger of similar magnitude to the offense the high court speculated about in *J. L.* As I explained in my dissenting opinion in *Wells*, *supra*, 38 Cal.4th at page 1091: "That the high court in *J. L.* left open the possibility that a catastrophic threat might justify a somewhat relaxed standard of reasonable cause to detain does not suggest we are now to rank all crimes along a sliding scale, permitting investigatory detentions on lesser showings when the detainees are suspected of more serious crimes. Certainly merely by mentioning the possibility of a threat 'so great' that some lesser degree of suspicion could justify a detention, the high court did not suggest such a regime." The majority's hypothetical of a freshly kidnapped child (maj. opn., *ante*, at p. 468, fn. 3) may be distinguished as just such a catastrophic threat. That some exceptions exist at the extreme outer edges of the law does not justify a wholesale jettisoning of the general rule that anonymous tips must be corroborated in some aspect of their criminality and not just as to their innocent details.

Also troubling is what the majority fails to include in its analysis, factors on which the *Wells* majority placed considerable importance. First, in concluding police in *Wells* had reasonable cause to stop the defendant's vehicle based solely on an anonymous tip, the *Wells* majority explained that "the

level of intrusion of personal privacy and inconvenience involved in a brief vehicle stop is considerably less than the 'embarrassing police search' on a public street condemned by *J. L.*, *supra*, 529 U.S. at page 272." (*Wells*, *supra*, 38 Cal.4th at p. 1087.) I disagreed with that reasoning (*id.* at p. 1093 (dis. opn. of Werdegar, J.)), and the majority appears to have abandoned it for this case. Had the majority chosen to apply that reasoning here, it would be forced to conclude it weighed against the search and seizure, for defendant was extracted from his vehicle at gunpoint and made to lie facedown on the pavement with his hands at his sides, hardly a trivial inconvenience or innocuous invasion of his personal privacy.

Second, the *Wells* majority justified the detention there by explaining that " 'in light of the pervasive regulation of vehicles capable of traveling on the public highways, individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares.' " (*Wells*, *supra*, 38 Cal.4th at p. 1087, quoting *In re Arturo D.* (2002) 27 Cal.4th 60, 68 [115 Cal.Rptr.2d 581, 38 P.3d 433].) I disagreed with that reasoning as well (*Wells*, at pp. 1092–1093 (dis. opn. of Werdegar, J.)) because the Fourth Amendment's auto exception, based as it is on the mobility of cars and the state's pervasive regulation of them, merely permits a more extensive search once a vehicle is lawfully stopped and the driver detained. With some exceptions not applicable here, the auto exception does not permit a detention and search on a lesser quantum of cause. Although defendant here was in his car parked on a public street when police encountered him, the majority, without explanation, has chosen not to invoke the auto exception to justify his detention and search.

By abandoning these twin rationales, central to the majority's reasoning in *Wells* but apparently of no use today, the majority sows substantial doctrinal doubt where additional clarity would be more appropriate. After today's decision, for example, one might wonder: Is the "level of intrusion of personal privacy and inconvenience" (*Wells*, *supra*, 38 Cal.4th at p. 1087) accompanying a particular detention a factor courts should consider when evaluating whether an anonymous tip justified the detention or not? Do anonymous tips require less corroboration when vehicles are concerned (as *Wells* suggested) or not? This uncertainty, created by the asymmetry of the majority opinions in *Wells* and the instant case, ill serves the bench, the bar, and—most importantly—the law enforcement authorities who are charged with the daily implementation of these increasingly complex legal rules.

I would instead pare down the analysis to its essential core and hold—as *J. L.*, *supra*, 529 U.S. 266, instructs—that an anonymous tip to police cannot justify a suspect's detention or search unless it is corroborated as to some aspect of the criminal activity reported, or other facts exist demonstrating the

reliability of the tip and/or the veracity of the tipster. Here, unlike in *Wells*, the tip itself provided some evidence the tipster was speaking from personal knowledge, having himself been the victim of the reported potentially violent crime that occurred only moments before. Under such circumstances, the tip, though essentially anonymous, bore sufficient indicia of reliability to provide police with reasonable cause to detain and search defendant. Accordingly, I concur in the result the majority reaches today, although, as explained above, I do not join in the whole of its reasoning.

Moreno, J., concurred.