Filed 3/12/14  P. v. Mitchell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

THE PEOPLE,

    Plaintiff and Respondent,

    v.

DEDRICK DESHAUN MITCHELL,

    Defendant and Appellant.

F066573

(Super. Ct. Nos. F11905053 & F09906417)

**OPINION**

-----

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson and Jonathan B. Conklin, Judges.[†]

Jake Stebner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

-----

[*]    Before Levy, Acting P.J., Franson, J., and Peña, J.

[†]    Judge Sanderson reviewed appellant's suppression motion as magistrate and later sentenced appellant.  Judge Conklin reviewed appellant's suppression motion made pursuant to Penal Code section 995 as the trial court and presided over his change of plea.

## INTRODUCTION

On September 2, 2011, a felony complaint was filed against appellant, Dedrick Deshaun Mitchell, alleging that he had a concealed firearm in a vehicle (Pen. Code, § 12025, subd. (a)(1), count 1),[1] was carrying a loaded firearm (§ 12031, subd. (a)(1), count 2), and was a former felon in possession of a firearm (§ 12021, subd. (c)(1), count 3). Appellant filed a suppression motion on December 27, 2011, contending his arrest was the product of an illegal police detention. The motion was heard during the preliminary hearing on January 13, 2012, and denied by the magistrate, who also held appellant to answer on all three allegations.

On January 20, 2012, the People filed an information making the same allegations in counts 2 and 3 but alleged in count 1 that appellant carried a concealed firearm on his person (§ 12025, subd. (a)(2)). Appellant failed to appear for a hearing on March 1, 2012, and a bench warrant was issued for his arrest. Appellant was apprehended on March 16, 2012, and denied bail.

On September 6, 2012, appellant moved to dismiss the information pursuant to section 995 arguing that his commitment was based on an illegal detention. On November 9, 2012, the trial court denied appellant's motion and the prosecutor entered into a plea agreement with appellant. Appellant executed a felony advisement, waiver of rights, and plea form waiving his constitutional rights pursuant to *Boykin/Tahl*,[2] and acknowledging the consequences of his plea. Under the agreement, appellant would admit count 1, serve a stipulated term of two years, and serve a concurrent sentence for his violation of probation in case No. F09906417. Two unrelated criminal actions and

---

[1]     Unless otherwise designated, all statutory references are to the Penal Code.

[2]     *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122 (*Boykin/Tahl*).

the remaining allegations in the instant action would be dismissed in exchange for appellant's change of plea.

The trial court reviewed the terms of the plea agreement with appellant and advised him of his constitutional rights pursuant to *Boykin/Tahl*. The parties stipulated to a factual basis for the plea based on the police reports and the preliminary hearing transcript.

Appellant pled no contest to count 1. On December 14, 2012, the trial court sentenced appellant to state prison for two years, including a concurrent term of two years in case No. F09906417. The court awarded appellant 717 days of custody credits in case No. F09906417 and 422 days of custody credits in the instant action. Appellant contends the trial court erred in denying his suppression motion. We disagree and affirm the judgment.

## FACTS

On September 1, 2011, Manuel Leyva was living in Fresno and working at a slaughterhouse. Leyva was awakened from his sleep by the sounds of people arguing in his front yard. Leyva went to his front room, looked outside, and saw two males and a female. He saw one of the males hand a handgun to the other male as they were walking away from Leyva's home. Leyva described the clothing worn by the male who received the gun as black. Leyva told the 911 dispatcher but could not remember exactly how he described what he saw to the dispatcher.[3]

Fresno Police Officer Joel Santos was on patrol that evening when he was dispatched to Olive and Millbrook at about 12:39 a.m. to investigate a subject possibly

---

[3]    Leyva told an investigator with the district attorney's office that he had seen two Black males and one Black female who were arguing. There was an exchange of a gun before Leyva called 911. The male who received the gun was wearing all black clothing and a hat. Leyva saw the three walk away down Olive in the direction of Millbrook.

3

armed with a gun. According to the dispatch report, which Santos received over his computer, there were two Black males and one Black female who had been arguing. They were last seen walking east on Olive. The subject in possession of the firearm was described as wearing dark clothing and a hat. From the time he was dispatched, it took Santos three or four minutes to arrive at the scene.

Near the 4100 block of Olive, Santos spotted two Black males and a Black female walking on the north side of Olive. One of the males was wearing dark clothing and a baseball hat. Santos passed the group, made a U-turn, and initiated contact by placing a spotlight on the trio. The subjects were four blocks east on Olive from the intersection of Millbrook and Olive. Because of the report that someone was armed, Santos detained the group with his handgun drawn for officer safety.

Santos ordered the three subjects to the ground. Within a few seconds, other officers arrived on the scene. Officer Villasenor handcuffed the suspect wearing the black hat and dark clothing. Santos watched Villasenor conducted a patdown search of appellant and saw Villasenor retrieve a .45-caliber handgun from appellant's waistband. Santos checked the serial number of the gun and found it had been stolen from Madera. Santos did not know the reporting party who called the police department.

Santos was familiar with the area of the arrest because of his duties as a patrol officer. The area was immediately outside of his regular beat. Santos regularly patrolled this area as well. The area had a high number of calls for service because of shots fired and weapons-related incidents. Santos described the area north and south of Olive as a residential area known for a high amount of drug and gang activity, arrests related to gangs, narcotics sales, and crime. Santos arrived at the scene just three or four minutes after being dispatched. When he saw the trio walking, no one else was around.

Officer Villasenor testified that as he arrived at the scene, he saw three individuals walking down the street. As Villasenor and his partner arrived, they heard Santos order

4

three subjects to the ground and saw Santos detaining them at gunpoint. Villasenor and his partner rushed to assist Santos and also drew their guns. Villasenor immediately handcuffed appellant.

Villasenor asked appellant twice if he had any weapons. After an initial delay, appellant replied, "Yes." Villasenor reached down to appellant's waistband and felt a hard, square surface. The object was a silver-colored handgun. Villasenor removed the ammunition magazine from the gun and made sure there was not a bullet in the chamber before turning the gun over to assisting officers. According to Villasenor, the neighborhood is a high crime area known for the presence of narcotics and firearms.

Appellant later waived his *Miranda*[4] rights and admitted he was contemplating committing a robbery, took the gun away from his companion, placed it inside his waistband, and was stopped a short time later. Appellant obtained the gun earlier that day. Appellant was aware that due to his status, it was illegal for him to possess any firearm. Appellant told investigators that he was on felony probation.

### SEARCH AND SEIZURE

Appellant contends the traffic stop violated the Fourth Amendment because the stop was conducted based on an anonymous tip, the detaining officers lacked sufficient reasonable suspicion that a crime had occurred or was about to occur to justify detention by ordering appellant to the ground by gunpoint, and the reporting party's information did not suggest imminent danger and it was not corroborated. We reject these contentions.

In reviewing a denial of a motion to suppress, an appellate court accepts the trial court's factual findings if supported by substantial evidence, but independently assesses whether the search and seizure conformed to constitutional standards of reasonableness.

---

[4]     *Miranda v. Arizona* (1966) 384 U.S. 436.

5

(*People v. Alvarez* (1996) 14 Cal.4th 155, 182.)  An appellate court accepts all facts in favor of the denial of the motion, including all reasonable inferences and deductions, if supported by substantial evidence.  (*People v. Miranda* (1993) 17 Cal.App.4th 917, 922.)

An officer may stop a vehicle based on a reasonable suspicion that the law has been violated.  (*People v. Wells* (2006) 38 Cal.4th 1078, 1082.)  Reasonable suspicion is a lesser standard than probable cause; an anonymous tip may give rise to a reasonable suspicion.  (*Id.* at p. 1083.)

In *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*), the United States Supreme Court held that an anonymous telephone tip in that case, which reported that a young Black male standing at a bus stop in a plaid shirt was carrying a gun was insufficient, without more, to justify a detention and patdown of the individual.  (*Id.* at p. 268.)  In *J.L.*, there was no audio recording of the tip, nothing was known about the informant, and it was unknown how long it took the police to respond to the tip.  Upon their arrival, the police officers observed no suspicious conduct on the part of the individual and there was no indication he might have been carrying a gun.  (*Ibid.*)

The court in *J.L.* recognized that there are situations, as in the case of *Alabama v. White* (1990) 496 U.S. 325 (*White*), where "an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  (*J.L.*, *supra*, 529 U.S. at p. 270.)  In *White*, predictive information in the tip was corroborated by the police and thus provided a reasonable basis to think the informant had inside knowledge about the suspect.  (*J.L.*, *supra*, at pp. 270-271.)  In contrast, the tip in *J.L.* lacked the indicia of reliability present in *White*.  All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L.  (*J.L.*, *supra*, at p. 271.)  The detention and search in *J.L.* were incompatible with the Fourth Amendment.

6

In *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*), an unidentified 911 caller reported that an African-American male had just pulled a gun on him and had said a gang name. The caller said he believed the perpetrator was about to shoot him. The caller specifically described the perpetrator, the parked vehicle the perpetrator was sitting in, and gave an exact location. When the police officers arrived at that location a few minutes later, they found the vehicle and a man sitting inside who matched the description provided by the caller. The officers asked him to get out of the car, at which time they found a loaded .38-caliber revolver. (*Id*. at p. 462.)

The issue before the Supreme Court was whether the anonymous tip was sufficient to justify the defendant's detention. The court concluded the detention was justified by reasonable suspicion of criminal activity under the totality of the circumstances. (*Dolly, supra*, 40 Cal.4th at pp. 465-466.) In reaching its conclusion, the Supreme Court considered a number of factors bearing upon the reasonableness of the detention and the reliability of the anonymous call. First, pointing a gun at the caller and threatening to shoot him posed a grave and immediate danger to the caller and anyone nearby. (*Id.* at p. 465.)

Second, the court in *Dolly* found there was no reason to think that anonymous phoned-in tips concerning contemporaneous threats with a firearm were more likely to be hoaxes than anonymous phoned-in tips concerning a contemporaneous event of reckless driving, which have been held to provide police with a reasonable suspicion to stop a vehicle. (*Dolly, supra,* 40 Cal.4th at p. 467.) The court noted that although the caller had not identified himself, the 911 call was taped, which made the call inherently more reliable because it raised the possibility that the caller could be identified by his voice and made it less likely that the call was a hoax or a false report. (*Ibid*.)

Third, the court in *Dolly* reasoned that the tipster-victim provided a firsthand, contemporaneous description of the crime which included an accurate and complete

7

description of the perpetrator and the perpetrator's location. These details were corroborated within minutes by the police when they arrived. (*Dolly, supra,* 40 Cal.4th at p. 468.)

Elaborating on this third point, the court emphasized that a primary determinant of an unknown tipster's reliability is the basis of his knowledge. (*Dolly, supra,* 40 Cal.4th at p. 468.) The court in *Dolly* distinguished its facts from those in *J.L.*, in which the informant failed to explain how he knew about a concealed gun, did not supply a basis for believing he had inside information, the record did not reveal when the caller discovered that the suspect had a concealed weapon or how soon the police responded to the call. *Dolly* found that the police may ascribe greater reliability to a tip, even an anonymous one, where an informant is reporting what he or she observed moments ago, not reporting stale or second-hand information. (*Dolly*, *supra*, at p. 468.)

Appellant argues that the informant was anonymous and unidentified. In doing so, he relies on a decision from this court, *People v. Jordan* (2004) 121 Cal.App.4th 544, 561-562 (*Jordan*). In *Jordan*, however, the informant was completely unidentified and refused to give his name to the 911 dispatcher. (*Ibid.*) Here, unlike *J.L.*, *Dolly*, and *Jordan*, the tipster identified himself to the dispatcher *and* testified at the preliminary hearing describing what he witnessed. The trial court did not err in its finding that this case is distinguishable from our *Jordan* decision.

As to appellant's argument that the informant was unknown to the investigating officers, we note that this was also true in *Dolly*, but our Supreme Court nevertheless found there was other indicia of reliability that was corroborated by the police and the lack of informant identity was not dispositive. As in *Dolly*, the police here were able to verify the information provided by Leyva, the citizen who called the 911 dispatcher. Santos received the dispatch over his computer. He and the other officers arrived at the scene within three or four minutes of the dispatch. There were three Black individuals,

8

two males and a female, walking east on Olive. The male who Leyva saw receiving a handgun was wearing a dark hat and clothing. It was late at night and there were no other people out on the street.

In addition to the officers' ability to corroborate the information provided by Leyva, they testified that the neighborhood was known for high crime, gang activity, drug trafficking, and narcotics sales. Leyva not only saw a gun being transferred from one male to the other, he did so in the context of hearing an argument. All of this information was known to Santos. When the patdown search was conducted, appellant was the only member of the trio wearing the dark hat and was the person in possession of a handgun.

Given the location of the event, the late hour, the absence of others on the street, and the fact that a firearm was involved in a high crime area, we find there was the imminent threat of danger and officers had enough information to detain appellant at gunpoint.

## RESTITUTION FINE

When appellant was placed on probation on August 17, 2011, in case No. F09906417, the trial court imposed restitution fines of $200 pursuant to sections 1202.4 and 1202.44. When the trial court sentenced appellant on December 14, 2012, it imposed restitution fines in each case (Nos. F11905053 and F09906417) of $480 pursuant to section 1202.4 and $480 pursuant to section 1202.45.[5] Appellant contends, and respondent concedes, that the trial court erred in imposing a new and higher fine in case No. F09906417 than had been imposed in 2011. We agree with the parties.

A restitution fine imposed when probation is granted remains the fine even if probation is later revoked. A fine in excess of the fine originally imposed after probation

---

[5] Restitution fines made pursuant to sections 1202.44 and 1202.45 are suspended unless and until a defendant's parole is revoked.

is revoked is unauthorized and must be stricken from the judgment.  (*People v. Urke* (2011) 197 Cal.App.4th 766, 779.)  Accordingly, we will remand this case for the trial court to strike the $480 restitution fine in case No. F09906417 and to impose the original $200 fine.

## DISPOSITION

The $480 restitution fine in case No. F09906417 is stricken.  The case is remanded for the trial court to impose the original fines of $200 pursuant to sections 1202.4 and 1202.44, prepare an amended abstract of judgment reflecting the change, and to forward the amended abstract of judgment to the appropriate authorities.  The judgment is otherwise affirmed.