[No. A113628. First Dist., Div. Four. Mar. 27, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMAR LINDSEY, Defendant and Appellant.

**COUNSEL**

Tara Mulay, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown Jr., Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gerald A. Engler and Eric D. Share, Assistant Attorneys General, and Nanette Winaker, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**SEPULVEDA, J.**—Jamar Lindsey appeals from a conviction following his no contest plea to being a felon in possession of a firearm. He contends that the trial court erred in denying his motion pursuant to Penal Code section

1538.5[1] to suppress evidence seized after a 911 call reported that a shot had been fired close to where Lindsey ultimately was detained and searched. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

About 9:30 p.m. on November 9, 2004, Pittsburg police dispatch received a 911 hang-up call that was traced to a residence on West Boulevard, a residential street. A few minutes later, dispatch received information from an anonymous female 911 caller that there was a shot fired outside that residence. According to the dispatch log, dispatch received the same telephone number, as well as a specific address and apartment unit, associated with the 911 calls. The log states that the caller "does not want contact" and "didn't see [the suspect] fire a gun or hold one."

Pittsburg Police Officer Charles Blazer was dispatched to the residence on West Boulevard after the report of a shot fired. A dispatcher told Blazer that the suspect was a Black male with small ponytails. Blazer later testified that he did not recall if he was told whether the caller informed the dispatcher that she had seen who fired the shot. Blazer had previously investigated murders and shootings in the area, which was known for high levels of drug and gang activity.

When he arrived near the residence on West Boulevard about five minutes after receiving the dispatch call, Blazer saw defendant walking with two other Black men. Defendant's hair was in small ponytails; his companions' hair was not. Defendant wore sweatpants and a dark, hooded jacket that hung over his waistline. He appeared to be holding up his pants at the waist with his right hand, and it appeared there was something heavy in his pocket or waistline.

From his marked patrol car, Blazer watched the three men walk on West Boulevard for about a block and a half. He did not observe them engaged in any suspicious activity. Defendant's hand was on his waistline for the entire time Blazer observed him walking on West Boulevard.[2] Blazer got out of his

---

[1] All statutory references are to the Penal Code.

[2] Defendant claims that respondent "somewhat exaggerates the state of the record" when it states that defendant did not let go of the object in his waistband the entire time that Blazer observed him, because Blazer watched defendant from behind. Blazer was able to observe, however, that defendant's right arm did not move, and Blazer "didn't see [defendant's hand] leave his waistline."

vehicle and asked the three men if he could speak with them. Defendant's two companions stopped. Defendant kept walking but turned back to address Blazer. Defendant eventually stopped and turned toward Blazer, who still could not see defendant's waistband. Blazer told defendant he was responding to a report of shots fired, and he asked defendant if he had a gun. Defendant told Blazer "something to the effect of, 'Blazer, you know me, I don't have a gun.' "

Blazer then initiated a patsearch of defendant.[3] At first, defendant appeared to agree to the patsearch. He turned toward Blazer and placed his left hand out at a 90 degree angle, with his right hand still holding his waist. Blazer walked to within two feet of defendant, who then turned and started to run away. Blazer grabbed defendant and tackled him to the ground.

Defendant was then handcuffed and searched. Blazer found a red sock, tied off at one end, that contained a revolver. The sock was tucked into the right side of defendant's waistband. The gun was fully loaded, except one bullet was missing, and the gun smelled as if it had been recently fired. Defendant told Blazer that he found the gun at a corner store.

Blazer previously had called two other officers to the scene. After defendant was handcuffed and searched, Officer Tony Del Greco went to the residence that was associated with the original 911 calls. He spoke briefly with a woman who confirmed that she called 911 to report that a shot had been fired. Del Greco testified that the woman refused to open her screen door, was "adamant" she be left alone, and "didn't want much to do with the entire incident."

Defendant was charged by information with being a felon in possession of a firearm, a felony. (§ 12021, subd. (a)(1).) The information included allegations that defendant had seven juvenile adjudications that constituted strikes under the three strikes law (§§ 667, subds. (b)–(i), 1170.12), had served a prior prison term (§ 667.5, subd. (b)), and was ineligible for probation (§ 1203, subd. (e)(4)).

---

[3] Blazer described the initiation of the patsearch at least three times. He testified at the preliminary hearing that he told defendant he "wanted" to patsearch him, and at the hearing on the motion to suppress that he "needed" to patsearch him. He also testified at the suppression hearing that he told defendant, "I am going to pat search you." The trial court concluded that the detention began at this point, a reasonable conclusion based on Blazer's testimony at the hearing on the motion to suppress.

Defendant filed a motion to suppress evidence seized after Blazer searched him. In denying the motion, the trial court stated, "I think everyone agrees this is not an issue of consensual stop. It's clearly [an] issue of detention and whether or not Officer Blazer had reasonable suspicion based on specific and articulable facts that allowed him to make the stop he did." The trial court concluded, based on the fact that defendant matched the description provided by the 911 caller and the fact that he was holding his pants in a "somewhat odd manner," that Blazer had reasonable suspicion to stop defendant.

On March 22, 2006, defendant pleaded no contest to being a felon in possession of a firearm, to one charge that he suffered an adjudication under the three strikes law, and to the charge that he had served a prior prison term. The trial court found defendant guilty, and sentenced him pursuant to a plea agreement to a total of five years in prison. This timely appeal followed.

DISCUSSION

"The standards for appellate review of the trial court's determination on a motion to suppress pursuant to section 1538.5 are well settled. The trial court's factual determinations are reviewed under the deferential substantial evidence standard; its determination of the applicable rule of law is scrutinized under the standard of independent review. [Citation.] We independently assess as a question of law whether, under such facts as found by the trial court, the challenged action by the police was constitutional. [Citation.]" (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 55–56 [102 Cal.Rptr.2d 798] (*Coulombe*) [officers had reasonable suspicion to detain and patsearch suspect following two in-person reports that a man near a restaurant about 75 feet away had a gun].)

Defendant claims that Blazer lacked reasonable suspicion to detain and patsearch him.[4] "A police officer may temporarily detain and patsearch an individual if he believes that criminal activity is afoot, that the individual is connected with it, and that the person is presently armed. (*Terry v. Ohio* (1968) 392 U.S. 1, 30 [88 S.Ct. 1868, 1884–1885, 20 L.Ed.2d 889].) The

---

[4] We agree with the trial court and defendant that the detention of defendant began when Blazer indicated he was going to patsearch defendant, as the stop was not consensual. (*Coulombe, supra,* 86 Cal.App.4th at p. 56, fn. 2 [detention refers to nonconsensual, temporary investigatory stop or seizure of person, which has not yet ripened into an arrest].) The stop was justified if the information known to Blazer *before* initiating the patsearch was sufficient to create a reasonable suspicion of criminal conduct. (*People v. Jordan* (2004) 121 Cal.App.4th 544, 553 [17 Cal.Rptr.3d 157].) We do not consider the fact that defendant tried to run from Blazer in determining whether Blazer was justified in searching defendant, as respondent suggests, because this took place after the initial detention.

issue is whether the officers can point to specific and articulable facts that give rise to a reasonable suspicion of criminal activity. Reasonable suspicion is a less demanding standard than probable cause and is determined in light of the totality of the circumstances. (*United States v. Sokolow* (1989) 490 U.S. 1, 7–8 [109 S.Ct. 1581, 1585–1586, 104 L.Ed.2d 1].)" (*Coulombe, supra,* 86 Cal.App.4th at p. 56, fn. omitted.) " 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' " (*Ibid.*)

The Supreme Court held in *Florida v. J. L.* (2000) 529 U.S. 266 [146 L.Ed.2d 254, 120 S.Ct. 1375] that an anonymous tip that a person is carrying a gun is insufficient, standing alone, to justify a stop and frisk of that person. (*Id.* at p. 268.) In *Florida v. J. L.*, the police received an anonymous tip that a young Black man standing at a bus stop was carrying a gun. (*Ibid.*) Nothing was known about the informant, and the record did not contain an audio recording of the tip. (*Ibid.*) Police went to the bus stop and, based only on the tip and not on the suspect's behavior, frisked a man who matched the description provided in the tip. (*Ibid.*) The court held that the anonymous tip lacked appropriate indicia of reliability because it provided no predictive information and did not give police the means to test the informant's knowledge or credibility. (*Id.* at p. 271.) The tip therefore did not justify a stop and frisk. (*Id.* at p. 274.)

Defendant relies primarily on *Florida v. J. L.* in arguing that the 911 call in this case was insufficient to justify Blazer's initial detention. The day after briefing was completed in this case, our Supreme Court issued *People v. Dolly* (2007) 40 Cal.4th 458 [53 Cal.Rptr.3d 803, 150 P.3d 693] (*Dolly*), which analyzes *Florida v. J. L., supra,* 529 U.S. 266 and dictates the result in this case. In *Dolly,* an unidentified man called 911 to report an assault with a firearm, and described the perpetrator, the car he was parked in, and his location. (*Dolly, supra,* at p. 462.) The caller stated he did not want to talk to police once they arrived at the scene because " 'if they find out I'm snitching, they're going to kill me around here.' " (*Ibid.*) When police arrived at the scene a few minutes later, they found a man who matched the description provided to radio dispatch, and he was sitting in a car that also matched the description provided by the 911 caller. (*Ibid.*) Police ordered the suspect to get out of his car, and a revolver was found under the front passenger seat. (*Ibid.*)

The *Dolly* court held that, in light of the totality of the circumstances, the anonymous 911 call supplied reasonable suspicion to detain defendant. (*Dolly*, *supra*, 40 Cal.4th at p. 465.) In reaching its conclusion, the court considered several factors. First, threatening the 911 caller with a revolver posed "a grave and immediate risk" to the caller and to anyone nearby. (*Ibid.*) Second, there is no reason to believe that anonymous 911 calls about contemporaneous threats with a firearm are any more likely to be hoaxes than anonymous calls regarding reckless driving, which have been held to provide police with a reasonable suspicion to stop a vehicle. (*Id.* at p. 467.) Third, the caller provided a "firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Id.* at p. 468.) Fourth, the 911 caller provided a reasonable explanation for wanting to protect his anonymity. (*Id.* at p. 469.)

In supplemental briefing to this court after *Dolly* was filed, defendant argues that this case is distinguishable on several grounds. We disagree.

*First*, as in *Dolly*, the conduct of shooting a gun on a residential street "posed a grave and immediate risk" to "anyone nearby." (*Dolly*, *supra*, 40 Cal.4th at p. 465.) This case is thus distinguishable from *Florida v. J. L.*, *supra*, 529 U.S. at page 268, where there was an allegation of a person carrying a gun " 'without more.' " (*Dolly*, *supra*, at pp. 465–466.) This case also is distinguishable from *People v. Jordan*, *supra*, 121 Cal.App. at page 548, upon which defendant relies, where police were informed that a suspect in a park was carrying, as opposed to using, a concealed handgun.[5]

*Second*, as in *Dolly*, we find no reason to think that an anonymous call to 911 about a report of gunfire is likely to be a hoax. (*Dolly*, *supra*, 40 Cal.4th at p. 467.) " '911 calls are the predominant means of communicating emergency situations' and 'are distinctive in that they concern contemporaneous emergency events, not general criminal behavior. . . . If law enforcement could not rely on information conveyed by anonymous 911 callers, their ability to respond effectively to emergency situations would be significantly curtailed.' " (*Ibid.*) The act of calling 911 and having a recorded telephone conversation involves a risk that the police could trace the call, as happened

---

[5] Defendant does not necessarily disagree that the report of a shot fired posed a risk to public safety, but argues that the 911 caller's report did not justify Blazer's search. We address the reliability of the 911 call below.

here when dispatch received an address and telephone number associated with the two 911 calls it received. (*Ibid.*) This case is thus distinguishable from *Florida v. J. L.*, 529 U.S. at page 268, where "*nothing* [wa]s known about the informant." (Italics added.)

Defendant stresses that the record suggests that the caller's address and telephone number were traced by computer, and that the caller did not provide this information to police. Even assuming this is true, as the concurrence recognized in *Florida v. J. L.*, "[i]nstant caller identification is widely available to police, and, if anonymous tips are proving unreliable and distracting to police, squad cars can be sent within seconds to the location of the telephone used by the informant." (*Florida v. J. L.*, 529 U.S. at p. 276 (conc. opn. of Kennedy, J.).) Police here were dispatched to the 911 caller's location after the first hang-up call was received; the source of the 911 call was not unknown. It is unlikely that a caller would phone in a "hoax" when police can travel to the person's home after receiving only a hang-up call. When police later contacted the woman at her residence, she acknowledged that she had called 911.

We disagree with defendant's assertion that there was "every reason to think that [the] anonymous tip [was] a hoax" because the caller somehow "disclaim[ed]" having seen the suspect do anything. According to the dispatch log, the 911 caller here told dispatch "this is the 3rd time this has happened. . . . [Caller] said her [*sic*] and her friend were outside where this BMA was, as they walked into the res[idence] they heard the shot—didn't see him fire a gun or hold one." While it is true that the caller may not have seen defendant actually fire a shot, the fact that this was the third time this had happened suggests that the caller was familiar with defendant, and had reason to believe he would fire a gun. The fact that she reported she did not actually see defendant holding a gun was not a "disclaimer" of witnessing criminal activity that made her "particularly unaccountable." She was simply being honest about the circumstances leading to her report.

■ *People v. Jordan, supra,* 121 Cal.App.4th 544, cited by defendant, does not change the result here. First, *Jordan* was decided before *Dolly* and without the benefit of our Supreme Court's analysis there. Additionally, in *Jordan* the court found it appropriate to analyze "the accountability of a particular informant in terms of (1) the ability of authorities to identify the informant, (2) the consequences the informant is likely to experience as a result of providing false information, and (3) the informant's perception of these factors." (*Id.* at p. 561.) In holding that an anonymous 911 call about a

man carrying a gun in a park was insufficient to provide officers with reasonable suspicion to search a suspect, the court noted that the record lacked information about whether the call was subject to tracing, or whether information about the origin of the call was retained so that any false report could be investigated. (*Id.* at pp. 561–562.) Here, by contrast, police were able to trace a telephone number and an address from the 911 calls, and they retained the dispatch log with this identifying information. Police later confirmed with a woman at that residence that she had called 911. Defendant's claim that "police were unable to use that information [about the caller's address] to identify the caller" is simply not true. The police contacted defendant first, before contacting the 911 caller. The police were justified in waiting to contact the 911 caller until after they completed their contact with defendant, due to the time-sensitive nature of the investigation. There is nothing in the record to support defendant's suggestion that police did not know they could later contact the caller.

Defendant claims that the woman contacted by police "demonstrated that she believed she was not accountable for [her] call." On the contrary, the fact that she acknowledged she made the call demonstrated she took responsibility for her tip. Police had no reason to hold her "accountable" for any false report, as they had already apprehended a suspect that matched the description she provided. In light of the fact that the caller put her anonymity at risk by calling 911, and expressed familiarity with the suspect's past conduct, we conclude that the tip had sufficient indicia of reliability.

*Third*, as in *Dolly*, the caller "provided a firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Dolly*, *supra*, 40 Cal.4th at p. 468.) Defendant attempts to distinguish *Dolly* by stressing that the caller here did not observe "firsthand" defendant fire a gun. (*Dolly*, *supra*, 40 Cal.4th at p. 467.) Again, we conclude that the caller provided sufficient " 'basis of [her] knowledge.' " (*Id.* at p. 468, quoting *U.S. v. Wheat* (8th Cir. 2001) 278 F.3d 722, 734.) The caller was unlike the anonymous tipster in *Florida v. J. L.*, *supra*, 529 U.S. at page 271, who "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about" the suspect. The 911 caller explained this was the third time this had happened, and she heard a shot after she had seen defendant and entered her residence.

Defendant claims that *People v. Wells* (2006) 38 Cal.4th 1078, 1086 [45 Cal.Rptr.3d 8, 136 P.3d 810] "stressed the importance that a tip indicate that the caller has 'actually witnessed' unlawful activity." Although it is true that is one factor to consider when evaluating the reasonableness of a stop of a

vehicle, the record in *Wells* was actually "*silent* as to the identity of the caller or circumstances leading to [a] call" about erratic driving, and the court *inferred* that the report was based on an anonymous phoned-in tip in upholding the reasonableness of the traffic stop at issue. (*Id.* at pp. 1081–1082, 1086, italics added.) Here, by contrast, police had more information about the caller and the circumstances leading to the call, as she described what happened before reporting a shot fired, and police were ultimately able to identify the caller. The caller thus did more than state she " 'believed' " someone had fired a shot, as defendant claims. (Cf. *State v. Lee* (1997) 282 Mont. 391 [938 P.2d 637, 640] [informant's belief that driver was under the influence and speeding insufficient to justify traffic stop].)

The caller accurately described defendant as being a Black man with small ponytails, and correctly identified his location. Blazer observed defendant holding what appeared to be something heavy in his pocket or waistline, in an "unusual" manner, where a gun was ultimately found. (*Coulombe, supra,* 86 Cal.App.4th at p. 58, fn. 5 [unusual movement toward pocket when suspect asked if he was armed could corroborate tips about a man carrying a gun].) The caller thus provided sufficient "predictive information" about defendant's behavior. (Cf. *Florida v. J. L., supra,* 529 U.S. at p. 271.) Although Blazer testified that he did not observe defendant engaging in any other suspicious or criminal activity, the fact that he saw defendant holding a heavy object in his waistband permitted him to conclude that defendant was armed and presently dangerous. (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111–112 [54 L.Ed.2d 331, 98 S.Ct. 330] [police justified in patsearching suspect after traffic stop once bulge was observed in his jacket]; *People v. Brown* (1985) 169 Cal.App.3d 159, 162, 165–166 [215 Cal.Rptr. 101] [upholding patsearch by officer who stopped man observed running out of corridor leading to bank and patsearched him after seeing a bulge in his jacket].)

We do not consider it significant that the caller inaccurately reported the direction in which defendant was walking. Police observed defendant close to the location reported for the 911 call soon after[6] the call was received, which supports a finding of reasonable suspicion.

Blazer testified that he decided to patsearch defendant because he "wasn't going to have a person with a gun in his waistline stand next to me to hurt me" while he detained defendant to determine whether he was involved with

---

[6] Blazer testified he arrived at the scene about five minutes after he first received the dispatch call reporting a shot fired, which is consistent with the dispatch log. While we agree with defendant insofar as he argues that the quick response time, standing alone, does not justify the police's stop and frisk, it is one factor to consider in evaluating a detention. (*Dolly, supra,* 40 Cal.4th at pp. 462, 468 [officers arrived two or three minutes after call to police ended].)

the report of a shot being fired. It was not necessary, as defendant claims, for Blazer to testify about whether his "training and experience" led him to believe that the way defendant was holding his pants was consistent with the conclusion that defendant was holding a gun. Blazer was able to point to specific and articulable facts that would lead a reasonable person to believe defendant was armed. (*Coulombe, supra,* 86 Cal.App.4th at pp. 56–57.) It likewise was not necessary for Blazer to testify that the way in which defendant held his pants was consistent with the conclusion he had a gun, as opposed to a benign heavy object. (*People v. Souza* (1994) 9 Cal.4th 224, 233 [36 Cal.Rptr.2d 569, 885 P.2d 982] [conduct consistent with criminal behavior supports reasonable cause to detain even if the conduct also is consistent with innocent behavior].)

■ *Fourth,* as in *Dolly,* there was a plausible explanation as to why the caller wanted to remain anonymous. (*Dolly, supra,* 40 Cal.4th at p. 469.) She was calling from a "high crime, high drug, high gang activity" area, and this was the third time this had happened. Blazer also testified that the area "ha[d] our particular interest because of the amount of gang activity, specifically the Norteno gang that is in that area and high level of drug activity that goes on in that area. I have investigated prior homicides and shootings in that area." "That the tipster 'may be understandably reticent to give identifying information for fear of retaliation or danger' reduces the significance of [her] anonymity in analyzing the reliability of [her] report. [Citation.]" (*Ibid.*)

■ Finally, we reject defendant's argument that this court's opinion in *Coulombe, supra,* 86 Cal.App.4th 52, relied upon by the trial court, is sufficiently distinguishable to justify reversal. In *Coulombe,* two people provided in-person tips to police officers, who were able to evaluate the informants' credibility. (*Id.* at p. 58.) While it is true that there was only one informant in this case, and her tip was received by telephone, the " 'totality of the circumstances' " here provided reasonable suspicion to support a detention and patsearch of defendant. (*Id.* at p. 56.) Police received a 911 call from a woman who stated she had seen a Black man with small ponytails, and then heard a shot fired as she entered her residence, the "[thi]rd time this ha[d] happened." Police were able to trace the caller's telephone number and address, and were able to later speak with a woman who confirmed she was the person who called 911. Blazer responded within minutes to the scene, a high-crime, residential street, and observed a man matching the description provided by the caller. Defendant was walking and holding what appeared to be a heavy object in his waistband. Under the totality of the circumstances, Blazer had a reasonable suspicion that defendant was involved in criminal activity and that he was presently armed and dangerous. (*Terry v. Ohio, supra,* 392 U.S. at p. 30; *Dolly, supra,* 40 Cal.4th at pp. 465–469.) The trial court did not err in denying the motion to suppress.

## DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied April 18, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 11, 2007, S152465.