Filed 9/4/20  P. v. Saravia CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D076390 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF002216) |
| LUCIO SARAVIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Monica Lepe-Negrete, Judge.  Reversed and remanded with directions.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

An anonymous tipster called 911 to report that she saw a "weird" man at a bus stop trying to hide a large knife in his pants.  A sheriff's deputy responded to the scene, identified defendant Lucio Saravia as the person the tipster described, patted him down, and found a machete in his pants and

methamphetamine in his hand.  After the trial court denied Saravia's suppression motion, he pleaded no-contest to carrying a concealed dirk or dagger (Pen. Code, § 21310)[1] and possessing a controlled substance (Health & Saf. Code, § 11377, subd. (a)).  The trial court sentenced him to 16 months on the weapon charge, and a concurrent 180-day term on the drug charge, both to be served concurrently with a two-year sentence in unrelated cases.

On appeal, Saravia challenges the ruling denying his suppression motion.  He asserts that although the circumstances of the anonymous tip may have borne sufficient indicia of reliability that Saravia was the person described by the tipster, the tip did not, standing alone, bear sufficient indicia of reliability that Saravia was engaged in criminal activity.  Thus, Saravia maintains the deputy was required—but failed—to independently corroborate some aspect of the tip's assertion of illegality before detaining and patting down Saravia.

On the record before the trial court at the time it ruled on the suppression motion, we agree the deputy lacked reasonable suspicion to detain and pat-down Saravia.  Although the deputy testified at the preliminary hearing about observations he made that would have established he had reasonable suspicion, he was not asked and did not testify about those observations at the subsequent suppression hearing, which was heard by a different judge who was not made aware of the deputy's prior testimony.[2]

---

[1]	Further undesignated statutory references are to the Penal Code.

[2]	Before ruling on the suppression motion, the court listed the materials it had reviewed and considered.  The list did not include the preliminary hearing transcript.

2

Accordingly, we reverse the trial court's ruling denying Saravia's suppression motion.[3]

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 2019, Saravia was charged by complaint with one count each of carrying a concealed dirk or dagger (§ 21310) and possessing a controlled substance (Health & Saf. Code, § 11377, subd. (a)).

At the preliminary hearing,[4] Imperial County Sheriff's Deputy Aaron Curiel testified about the circumstances leading to Saravia's current charges. On May 15, 2019, at about 9:42 a.m., Curiel was dispatched in response to a call about a man across the street from the United Food Center attempting to conceal a large knife in his pants. Curiel arrived at the scene within one minute of being dispatched and observed a man (later determined to be Saravia) who matched the description of the suspect provided by dispatch, sitting on a concrete slab next to a bus stop, playing with rocks and talking to himself. Curiel testified that "what caught [his] attention was [Saravia's] feet were straight out . . . , and if he was concealing a large knife, he would have to sit like that."

Curiel approached Saravia and asked him to stand. Saravia complied. The deputy did not see any weapons, nor did he see Saravia attempt to conceal anything. Curiel directed Saravia to turn around, at which point Saravia reached into his pocket and pulled something out. The deputy grabbed Saravia's hands and patted him down, revealing a machete

_____

[3] Because we are reversing, we need not address Saravia's additional claim that the trial court miscalculated his custody credits by one day.

[4] Saravia had not moved to suppress any evidence at or before the preliminary hearing.

concealed in Saravia's pants. Curiel "noticed [Saravia's] pants had holes in them to where when he was . . . putting his knife in, it looked like [it] had been cutting his pants when taken in and out."

Curiel removed the machete, handed it to another deputy who had responded to the scene, and arrested Saravia. While handcuffing Saravia, Curiel found in Saravia's hand a bindle containing a rock that appeared to be methamphetamine.

The court held Saravia to answer on the weapon and drug charges, and found he violated probation in other cases. A few months later, after the court denied Saravia's subsequent motion to suppress the evidence seized by Curiel, Saravia pleaded no-contest to the current charges. The preliminary hearing served as the factual basis for Saravia's plea.

The trial court sentenced Saravia to 16 months on the weapon charge, and a concurrent term of 180 days on the drug charge, both to run concurrent to a two-year state prison term Saravia was serving in the cases in which he violated probation. The court credited Saravia with "180 days already served, consisting of 90 actual days and 90 behavioral days."

## DISCUSSION

### I. *The Trial Court Erred in Denying Saravia's Suppression Motion*

Saravia contends the trial court erred by denying his motion to suppress the evidence discovered by Deputy Curiel because the deputy lacked reasonable suspicion to detain and pat-down Saravia. Based on the prosecution's evidentiary showing at the suppression hearing, we agree.

### A. *Background*

About six weeks after the preliminary hearing, Saravia moved to suppress all evidence against him on the basis his warrantless detention was

4

unlawful.  (§ 1538.5.)  The prosecution opposed the motion, arguing that an anonymous tipster's 911 call about a man with a concealed knife provided reasonable suspicion to detain and pat-down Saravia.  The Public Safety Dispatcher/911 operator who fielded the 911 call and Curiel testified at the suppression hearing.

### 1. *Operator's Testimony*

The operator testified she handled a 911 call at about 9:42 a.m. on May 15, 2019.  The caller reported she had been waiting at a bus stop across the street from the United Food Center, but chose to wait across the street because she "was concerned" that a "weird" man at the bus stop "had a large knife" that he was "trying to hide in his pants."  The caller described the subject as a Hispanic male wearing white sunglasses, a long-sleeved light-blue shirt, and gray Levi's pants.  The caller said she was looking at the man while she was on the phone with the operator.  The caller explained she wished to remain anonymous because "she didn't want problems" and "want[ed] to get on the bus."

The operator acknowledged on cross-examination that she did not know anything about the caller, but explained the call was "traceable by phone number" and audio-recorded (though the recording was not admitted at the hearing).  The operator further explained she contemporaneously entered the details of the call into the "CAD" call-log system, which she described as follows:

> "The call comes in.  Depending on what type of call it is, there are different . . . key words or codes that we use on the command line.  From there, we can generate a call. There are options to put in a law enforcement type, fire type, or ambulance type, or an airship.  From there, we generate the call for service with an incident number. There is a place for a location.  Then from there, there's a

5

complainant box, which is usually populated by the caller's name and their information. In the information box, we place any relevant information pertaining to the call."

The CAD entry for the call at issue, which was admitted as an exhibit, states in pertinent part:

> "HMA LSW [presumably, Hispanic male adult, last seen wearing]: whi sunglasses, light blue long sleeve shirt, gry Levi's, subj is at the bus stop and RP [presumably, reporting party] did see a large knife that he was trying to hide in his pants. She adv she's across the street, also waiting for the bus not req. contact." (Capitalization omitted.)

### 2. *Deputy Curiel's Testimony*

Curiel testified he had been a sheriff's deputy for about seven months. Around 9:44 a.m. on May 15, he was dispatched to a bus stop area across from the United Food Center. Curiel testified "[t]he nature of the call was a male subject with a large knife in his pants." He understood the suspect was "a Hispanic male with a long-sleeved shirt, blue colored, white sunglasses on, [gray or navy blue pants,] and I believe she stated he was wearing a hat." According to the CAD, Curiel arrived on the scene within about four minutes of being dispatched.

Upon arriving at the scene, Curiel saw a man (later determined to be Saravia) who matched the description dispatch had provided. Saravia was sitting on a concrete curb or slab in a dirt lot next to the bus stop, "playing with rocks on the ground." Two females were on the curb near Saravia, and four or five other people were in the bus stop area.

Curiel parked his vehicle about 20 feet from Saravia and exited. Curiel then directed Saravia to stand up, walk toward him, and turn around and place his hands behind his back. On direct examination, Curiel testified that "right when [he] told [Saravia] to stand up, [Saravia] *immediately* started

6

trying to reach in his waistband or his pockets . . . ." (Italics added.) On cross-examination, however, Curiel clarified he "believe[d] it was while [he] told [Saravia] to turn around" that Saravia reached toward his waistband or pocket area. When Saravia reached, Curiel grabbed his hands.

Curiel testified that based on the nature of the call and Saravia's reaching motion, Curiel was concerned for his own and the public's safety. Accordingly, Curiel patted-down Saravia and felt a hard object in Saravia's waistband next to his hip, extending down the leg and coming to a "tip point." When Saravia realized Curiel had discovered the object, Saravia "started to kind of pull away." Curiel handcuffed Saravia, retrieved the concealed object—a machete—from Saravia's waistband, and handed it to another responding deputy.[5]

Unlike at the preliminary hearing, which was presided over by a different judge, Curiel did *not* testify at the suppression hearing that when he arrived on the scene he saw Saravia sitting with his legs straight or that Saravia's pants had holes consistent with being cut by a concealed knife.

### 3. *Argument and Ruling*

The trial court directed counsel to focus their argument on distinguishing the facts of this case from those in *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*), in which the Supreme Court held that an anonymous caller's tip to police—"that a young [B]lack male standing at a particular bus stop and wearing a plaid shirt was carrying a gun"—did not provide reasonable suspicion to pat-down a person at that bus stop who fit the description. (*Id.* at p. 268.)

---

[5] Saravia limited his suppression motion to the initial detention and pat-down, so Curiel did not testify about the subsequent search that yielded the bindle of methamphetamine.

7

The prosecutor argued the tip here was more reliable because it related a firsthand account of criminal activity (concealing a knife) that the tipster "was describing . . . as she was seeing it." Thus, the prosecutor reasoned Curiel had reasonable suspicion to detain Saravia, whose suspicious hand movements further justified the pat-down.

Defense counsel argued *J.L.* is "directly on point" because, like there, Curiel here corroborated only that the tipster's physical description of the suspect was accurate. Curiel did not corroborate that the tip was also "reliable in its assertion of illegality," as required.

After explaining it had "thought about [this case] long and hard," the trial court denied the suppression motion. The court found it "very clear" that Curiel "didn't see any suspicious behavior" and, thus, the court was basing its reasonable suspicion determination entirely on the anonymous tip. The court found the tip reliable, in part, because unlike the tip in *J.L*, which "was that he was carrying a gun, period," the tip here "was not that he was carrying a knife, period, it was that he was trying to conceal a very large knife *in his pants*." (Italics added.) The court found it significant that Saravia "was in fact, when contacted, wearing pants." The court also found it "very important" that the tipster contemporaneously recounted what she "personally saw." Thus, the court reasoned, unlike the tipster in *J.L.*, "we know how [the] caller knows what she claims to know, we know what she saw because she described it to us . . . ."

## B. *Legal Principles*

### 1. *Standard of Review*

When a defendant moves to suppress evidence on the basis that a "search or seizure without a warrant was unreasonable" (§ 1538.5, subd. (a)(1)(A)), the prosecution has " 'the burden of proving that the warrantless

search or seizure was reasonable' " (*People v. Smith* (2020) 46 Cal.App.5th 375, 382 (*Smith*); see *People v. Johnson* (2006) 38 Cal.4th 717, 723 (*Johnson*).)

"[I]n reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled." (*In re Arturo D.* (2002) 27 Cal.4th 60, 77, fn. 18 (*Arturo D.*); see *People v. Moore* (2006) 39 Cal.4th 168, 171 (*Moore*).) We defer to the trial court's " ' "express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 979.) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. 'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' [Citation.] We review its factual findings ' " 'under the deferential substantial-evidence standard.' " ' [Citation.] Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling' [citation]. Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Ibid.*)

## 2. *Cases Governing Anonymous Tips*

"[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."

9

(*U.S. v. Sokolow* (1989) 490 U.S. 1, 7; see *Terry v. Ohio* (1968) 392 U.S. 1, 30; *People v. Souza* (1994) 9 Cal.4th 224, 231.) " 'The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability[,]" [citation] . . . . tak[ing] into account "the totality of the circumstances . . . ." ' " (*People v. Brown* (2015) 61 Cal.4th 968, 981 (*Brown*).)  If upon detaining a person based on reasonable suspicion, the officer "is justified in believing that the individual . . . he is investigating at close range is armed and presently dangerous to the officer or to others" (*Terry*, at p. 24), the officer may conduct a search "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby" (*id*. at p. 26).

The United States Supreme Court and California Supreme Court have provided guidance on when an anonymous tip may provide reasonable suspicion sufficient to justify an investigatory detention.

In *Alabama v. White* (1990) 496 U.S. 325 (*White*), the Supreme Court held an anonymous tip had sufficient indicia of reliability where the tipster informed police that a specific person would be carrying a brown attaché case containing cocaine while traveling between two specific locations at a specific time and in a specific vehicle.  (*Id*. at p. 327.)  After the police observed the defendant and corroborated certain preliminary aspects of the tip, they initiated a traffic stop and conducted a consensual search during which they discovered marijuana in a brown attaché case and cocaine in the defendant's purse.  (*Ibid*.)  Although a divided Supreme Court found it "a close case," the court "conclude[d] that under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop . . . ." (*Id*. at p. 332.)  The court found it significant that the tipster was able "to predict [the defendant]'s *future*

10

*behavior*, because [this] demonstrated inside information—a special familiarity with [the defendant]'s affairs," which "imparted some degree of reliability to the other allegations made by the [tipster]." (*Ibid*.)

In *J.L.*, *supra*, 529 U.S. 266, the court considered "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." (*Id.* at p. 268.) As noted, the police in *J.L.* received an anonymous phone call reporting "that a young [B]lack male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." (*Id.* at p. 268.) Some unspecified time after the call, officers responded to the bus stop and saw three Black males, one of whom (the 15-year-old defendant) was wearing a plaid shirt. (*Id.* at p. 268.) "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and [the defendant] made no threatening or otherwise unusual movements." (*Ibid*.) Nonetheless, one of the officers approached the defendant, told him to raise his hands, frisked him, and seized a gun from his pocket. (*Ibid*.) The Supreme Court concluded the officers lacked reasonable suspicion for the investigatory detention. (*Id.* at pp. 268, 274.)

The *J.L.* court recognized "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " (*J.L.*, *supra*, 529 U.S. at p. 270.) But the court concluded such indicia were lacking because, unlike the predictive information corroborated in *White*, "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." (*J.L.*, at p. 271.) The court found it insufficient that the officers had corroborated the tip as to

11

the suspect's appearance and location, because "reasonable suspicion . . . requires that a tip be reliable . . . not just in its tendency to identify a determinate person," but also in "its assertion of illegality." (*Id.* at p. 272.)

The *J.L.* court declined to adopt a " 'firearm exception' " to the corroboration requirement. (*J.L.*, *supra*, 529 U.S. at p. 272.) The court recognized there may be some "circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability," such as "a report of a person carrying a bomb." (*Id.* at p. 273.) But the court concluded that a report of mere possession of a concealed firearm was an insufficient exigency to justify "an intrusive, embarrassing police search." (*Id.* at p. 272.)

The California Supreme Court distinguished *J.L.* in *People v. Wells* (2006) 38 Cal.4th 1078 (*Wells*), which upheld a traffic stop based on an anonymous, uncorroborated phoned-in tip describing a particular vehicle at a particular location " 'weaving all over the roadway.' " (*Wells*, at pp. 1080-1081.) First, the court found that "a report of a possibly intoxicated highway driver . . . poses a far more grave and immediate risk to the public than [the] report of mere passive gun possession" at issue in *J.L.* (*Wells*, at p. 1087.)[6]

_____

6    The *Wells* court elaborated on this distinction by quoting the Vermont Supreme Court: " '[I]n contrast to the report of an individual in possession of a gun, an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action. In the case of a concealed gun, the possession itself might be legal, and the police could, in any event, surreptitiously observe the individual for a reasonable period of time without running the risk of death or injury with every passing moment. An officer in pursuit of a reportedly drunk driver on a freeway does not enjoy such a luxury. Indeed, a drunk driver is not at all unlike a "bomb," and a mobile one at that.' " (*Wells*, *supra*, 38 Cal.4th at p. 1086, quoting *State v. Boyea* (Vt. 2000) 765 A.2d 862, 867.)

Second, the court reasoned "doubts regarding the tipster's reliability and sincerity are significantly reduced" when the tip relates the caller's contemporaneous, presumably firsthand observations. (*Ibid.*) "Third, the level of intrusion of personal privacy and inconvenience involved in a brief vehicle stop is considerably less than the 'embarrassing police search' on a public street condemned by *J.L.*" (*Ibid.*) Finally, "the relatively precise and accurate description given by the tipster" and "confirmed by the investigating officer within minutes of receiving the report, enhanced the reliability of the tip." (*Id.* at p. 1088.)

California's high court revisited anonymous tips one year later in *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*). In *Dolly*, a caller reported to a 911 dispatcher that "a light-skinned African-American male had 'just pulled a gun' on him and had mentioned a gang name." (*Id.* at p. 462.) The caller said "the perpetrator had a bandage over his left hand, as though it had been broken, and was in the driver's seat of a gray Nissan Maxima" parked near a specific intersection. (*Ibid.*) The caller said he wanted to remain anonymous for fear of retaliation. (*Ibid.*) Two minutes later, the caller called 911 again, identified himself as "Drew," and clarified that the Maxima was black, not gray. (*Ibid.*) Immediately after the second call, the dispatcher radioed officers about "a light-skinned African-American male with a cast on his arm" who "was said to have threatened the 911 caller with a gun." (*Ibid.*) The dispatcher described the car and location provided by the caller. (*Ibid.*) Within two or three minutes, responding officers located a suspect matching the caller's description of the perpetrator, in a black Maxima, at the location reported by the caller. (*Ibid.*) Officers ordered the suspect to exit his vehicle and lie down in the street, whereupon an officer searched the car and found a revolver under the front passenger seat. (*Ibid.*)

13

Building on *Wells* and distinguishing *J.L.*, the *Dolly* court concluded the anonymous tip provided reasonable suspicion for the detention. (*Dolly*, *supra*, 40 Cal.4th at pp. 461, 471.) First, the court found the "defendant's conduct in pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk" that was " 'materially distinguishable from the anonymous tip at issue in . . . *J.L.*,' which involved only an allegation of a concealed weapon." (*Id.* at p. 465.) The court reasoned "[a]n allegation concerning the possession of a concealed weapon, 'without more' [citation], does not present an emergency situation involving an immediate danger to human life." (*Id.* at pp. 465-466.) Second, the court posited "there is no reason to think" a recorded and traceable 911 call about a contemporaneous threat would be any less reliable than the call about reckless driving at issue in *Wells*. (*Dolly*, at p. 467.) Third, the court observed that the tipster's firsthand, contemporaneous description of the perpetrator, the crime, and the location were " 'sufficiently copious and precise.' " (*Id.* at p. 469.) Finally, the court was reassured by the fact "the caller supplied a plausible explanation for wanting to remain anonymous." (*Ibid.*)

The United States Supreme Court addressed anonymous tips again in *Navarette v. California* (2014) 572 U.S. 393 (*Navarette*), which addressed the validity of a traffic stop based solely on an anonymous tip from a fellow motorist. The anonymous tipster in *Navarette* called 911 to report that a specific vehicle with a specific license plate had run the caller off the road at a specific location. (*Id.* at p. 395.) Police responded within 18 minutes and identified the vehicle near the location the caller had reported. (*Ibid.*) After following the truck for about five minutes (*ibid.*), during which police did not

14

observe any reckless driving (*id.* at p. 403), they pulled over the truck and found 30 pounds of marijuana in the truck bed (*id.* at p. 395).

The Supreme Court concluded the anonymous tip provided reasonable suspicion for the investigative stop. First, "in contrast to *J.L.*, where the tip provided no basis for concluding that the tipster had actually seen the gun," the *Navarette* "caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." (*Navarette, supra*, 572 U.S. at p. 399.) Second, the fact "that the tip . . . was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event . . . weigh[ed] in favor of the caller's veracity . . . ." (*Id.* at p. 400; see *ibid.* ["There was no indication that the tip in *J.L.* (or even *White*) was contemporaneous . . . or made under the stress of excitement"].) Third, the fact that 911 systems can record and trace calls "provide[s] some safeguards against making false reports with immunity." (*Id.* at p. 400.)

Despite these indicia of reliability about the tip, generally, the *Navarette* court observed that "[e]ven a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.' " (*Navarette, supra*, 572 U.S. at p. 401.) Because the specific conduct reported by the tipster bore such "a resemblance to paradigmatic manifestations of drunk driving" (*id.* at p. 403), and because "allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences" (*id.* at p. 404), the court concluded the officers were not obligated to follow the suspect at length to personally observe suspicious driving (*ibid.*). The court acknowledged, however, that "[l]ike *White*, this is a 'close case.' " (*Id.* at p. 404.)

## C. *Analysis*

Even assuming (without deciding) Deputy Curiel was privy to all the information the 911 operator knew about the anonymous tip, we conclude that, on the record before the trial court at the suppression hearing, Curiel lacked reasonable suspicion to detain and pat-down Saravia.

There is no question that the anonymous tip here bore significant indicia of reliability. The tipster's 911 call was traced and recorded. (See *Dolly*, *supra*, 40 Cal.4th at p. 467; *Navarette*, *supra*, 572 U.S. at p. 400.) She related her firsthand, contemporaneous observations. (See *Wells*, *supra*, 38 Cal.4th at p. 1087; *Dolly*, at p. 469; *Navarette*, at pp. 399-400.) The tipster provided a precise description of the suspect's appearance, actions, and location. (See *Wells*, at p. 1088; *Dolly*, at p. 468.) And the tipster provided a plausible explanation for wishing to remain anonymous. (See *Dolly*, at p. 469.)

Moreover, the reliability of the anonymous tip was corroborated as to the suspect's appearance and location. Curiel arrived at the specified scene within about four minutes of the anonymous call and immediately saw a person matching the description the tipster provided. (See *Wells*, *supra*, 38 Cal.4th at p. 1088; *Dolly*, *supra*, 40 Cal.4th at p. 471; *Navarette*, *supra*, 572 U.S. at p. 399.)

But the fact the tip proved reliable as to identity and location is insufficient to establish its reliability as to its assertion of illegality. (*J.L.*, *supra*, 529 U.S. at p. 272; *Navarette*, *supra*, 572 U.S. at p. 401.) And on the record before the trial court at the suppression hearing—to which our review is limited (*Arturo D.*, *supra*, 27 Cal.4th at p. 77, fn. 18; *Moore*, *supra*, 39 Cal.4th at p. 171)—the anonymous tip bore insufficient indicia of reliability as to its assertion of illegality.

True, unlike the tip in *J.L.*, the tip here more specifically indicated where on the suspect's body the weapon was concealed, and how the tipster knew that. However, these assertions were corroborated only by the fact Saravia was, in fact, wearing pants. Nothing in the record suggests there was anything unique or particularly probative about that fact.

In contrast to the suppression hearing, the prosecution introduced evidence at the preliminary hearing that corroborated the tip's assertion of illegality. Specifically, Curiel testified at the preliminary hearing that he saw Saravia sitting unnaturally straight-legged in pants with holes, suggesting the presence of a concealed large knife. Had Curiel testified to these observations at the suppression hearing, we would have upheld the detention and pat-down. But Curiel's prior testimony was not presented to the judge at the suppression hearing, and the prosecutor—who appeared at both hearings—did not elicit these observations from Curiel at the suppression hearing. It was the prosecution's burden to do so. (*Johnson*, *supra*, 38 Cal.4th at p. 723; *Smith*, *supra*, 46 Cal.App.5th at p. 382.)

Similarly, had Curiel testified unequivocally at the suppression hearing that Saravia reached suspiciously toward his own pockets or waistband before being detained, we likely would have found the detention and pat-down justified under the circumstances. (See, e.g., *People v. Coulombe* (2000) 86 Cal.App.4th 52, 58, fn. 5 ["defendant's unusual movement to his pocket . . . could have supplied corroboration of the tip that he was armed, if it preceded his detention"]; *People v. Lindsey* (2007) 148 Cal.App.4th 1390, 1400 ["the fact that [the officer] saw defendant holding a heavy object in his waistband permitted him to conclude that defendant was armed and presently dangerous," as reported].) However, a fair reading of Curiel's suppression hearing testimony is that Saravia did not reach for his pocket or waistband

17

until after he had been detained. This reading is borne out by the trial court's express finding that it was "very clear" Curiel "didn't see any suspicious behavior" prior to the detention and pat-down.

We recognize the anonymous tip here bore similar indicia of reliability as the anonymous tips upheld in *Wells*, *Dolly*, and *Navarette*. But the courts in those cases largely relaxed the corroboration-of-illegality requirement because of the "emergency situation[s] involving an immediate danger to human life" created by the offenses at issue in those cases. (See *Dolly*, *supra*, 40 Cal.4th at p. 466 [threat with a gun]; *Wells*, *supra*, 38 Cal.4th at p. 1087 [intoxicated driving]; *Navarette*, *supra*, 572 U.S. at p. 404 [intoxicated driving can "have disastrous consequences"].) Indeed, in so doing, our state's high court expressly distinguished the dangerousness of those offenses from mere possessory offenses like the one at issue here. (See *Wells* at p. 1087 ["a report of a possibly intoxicated highway driver . . . poses a far more grave and immediate risk to the public than a report of mere passive gun possession"]; see *id.* at p. 1084 ["Subsequent California cases involving reports of possessory offenses rather than possible intoxicated driving reach similar results" as *J.L.*]; *Dolly* at pp. 465-466 ["An allegation concerning the possession of a concealed weapon, 'without more' [citation], does not present an emergency situation involving an immediate danger to human life."].)

Further distinguishing the detention here from those upheld in *Wells* and *Navarette* is the fact Saravia was *personally* detained and patted down at a busy bus stop, rather than merely subjected to a routine traffic stop. (See *Wells*, *supra*, 38 Cal.4th at p. 1081; *Navarette*, *supra*, 572 U.S. at p. 395.) "Routine traffic detentions are considerably less intrusive than a search." (*Brown*, *supra*, 61 Cal.4th at p. 986; see *Wells*, at p. 1087 ["the level of intrusion of personal privacy and inconvenience involved in a brief vehicle

18

stop is considerably less than [an] 'embarrassing police search' on a public street"].)

In sum, based on the evidence presented at the suppression hearing, Curiel lacked reasonable suspicion to detain and pat-down Saravia. Accordingly, the trial court erred by denying Saravia's suppression motion.

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to vacate its order denying Saravia's suppression motion and to enter a new order granting it.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

19